THE NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY *vs.* THE BRIDGEPORT TRACTION COMPANY.

Third Judicial District, Bridgeport, October Term, 1894.* Andrews, C. J., TORRANCE, FENN, BALDWIN and HAMERSLEY, Js.

A railroad company holds its right of way charged with the performance of a trust for its safe and continuous use for the public accommodation, and can maintain a suit for an injunction against an unlawful obstruction of its tracks which will interfere with its operations and endanger the lives of its passengers and employees.

Its right of way across a highway is, however, not superior in kind to that of any other corporation authorized by the State to use such highway for the purposes of travel. Accordingly, it cannot recover compensation from an electric tramway company for the lawful location of its

---

* Heard at New Haven, November 28th, by consent of the court.

tracks across those of the former company on such highway. Such impairment of its property is *damnum absque injuria.*

Where a special charter is followed by general legislation on the same subject, which does not in terms, or by necessary construction, repeal the particular grant, the two are to be deemed to stand together; one as the general law of the land, the other as the law of the particular case.

The General Assembly of 1893, on June 14th, passed a public Act providing that "no electric, cable, or horse railroad shall hereafter be constructed across the tracks of a steam railroad at grade, except upon application to, and approval by, the railroad commissioners." This Act took effect on July 30th. On June 28th, said Assembly passed a private Act taking effect on its passage, chartering an electric railway in Bridgeport, with power to cross the tracks of any steam railroad at grade, under such regulations and restrictions as the railroad commissioners should establish for the safety of the public, and to consolidate with other companies chartered the same day, with similar privileges. The concluding section of this charter was as follows: "Except as otherwise expressly provided herein, this charter is subject in all its parts to the general laws relating to street railways and street railway companies." *Held* that the Public Act of June 14th did not repeal the grant of a right to cross the steam railway at grade contained in the charter, nor make it necessary to obtain the approval of the railroad commissioners. (Two judges dissenting.)

[Argued November 28th, 1894—decided January 8th, 1895.]

SUIT for an injunction to prevent and restrain the defendant from constructing its electric railway across and upon the tracks of the plaintiff at a certain highway crossing in the city of Bridgeport; brought to the Superior Court in Fairfield County and tried to the court, *Shumway, J.;* facts found and judgment rendered for the plaintiff and appeal by the defendant for alleged errors in the rulings of the court. *Error, judgment reversed.*

The case is sufficiently stated in the opinion.

*Thomas N. McCarter,* of New Jersey, and *Morris W. Seymour,* with whom was *Howard H. Knapp,* for the appellant (defendant).

I. The legislature gave the defendant, in express terms, the right to construct its electric line across the tracks of the plaintiff at grade, subject to certain regulations and restrictions, all of which as the finding shows, have been fully complied with. But the plaintiff contended, and their contention was sustained by the court below, that although we had

taken all these steps, these provisions which permitted us to cross the plaintiff's road at grade had been repealed by the General Act of the legislature, approved June 14th, 1893, and found on page 391 of the Public Acts of that year. The claim of the steam railroad is, that this Act of 1893, while approved June 14th, took effect under chapter 246 of the Public Acts of 1893, page 398, thirty days after the rising of the General Assembly, that is, on July 30th, 1893—a date later than the date when the charter of the defendant company went into effect. And that this fact creates an implied repeal of all those provisions contained in the charter of the defendant company, and of the companies with which it was consolidated, relating to the prescribing of rules and regulations by the railroad commissioners, and required in place of or in addition to this, the obtaining of " the approval " of the railroad commissioners.

That repeals by implication are not favored in the law is a principle too well established to need discussion. When questions of this character arise, the first canon of interpretation is the question of intent. Did the legislature, by the prior Act of June 14th, 1893, intend to repeal the subsequently enacted provisions of the defendant's charter?

Particular statutes are not repealed by subsequent general statutes, unless so expressed in definite terms. *Coe* v. *Meriden*, 45 Conn., 156 ; Sutherland on Stat. Constitution, §§ 157, 158, 159 ; *Mobile etc. R. R. Co.* v. *State*, 29 Ala., 573 ; *Fitzgerald* v. *Champneys*, 2 Johns. & H., 54 ; *Walsall* v. *London R. R. Co.*, 4 App. Cas., 467 ; *Slate* v. *Stoll*, 17 Wall., 425 ; *VanDenburgh* v. *Greenbush*, 66 N. Y., 1 ; *Deposit* v. *Vaill*, 6 Hun, 613 ; *Com.* v. *Richmond R. R. Co.*, 81 Va., 345 ; *Hudson Co. R. R.* v. *Hoboken*, 41 N. J. L., 178 ; Endlich on Interpretation of Statutes, § 229 ; *Pierce* v. *Bank*, 33 Ala., 702 ; *Furman* v. *Nichol*, 8 Wall., 44 ; *Brown* v. *Lowell*, 8 Metc., 172 ; *Nichols* v. *Bertram*, 3 Pick., 342 ; *The Cascade R. R. Co.* v. *Sohns*, 1 Wash. Ter., 558 ; *Gunnarssohn* v. *City of Sterling*, 92 Ill., 569 ; *Third National Bank* v. *Harrison*, 8 Fed. Rep., 721 ; *Tylers' Executors* v. *E. & P. R. R. Co.*, 9 Bush (Ky.), 501 ; *Ex parte Crow Dog*, 109 U. S., 556 ; Dillon on Mun. Corp.,

§ 87; *Hyde Park* v. *Cemetery Association*, 109 Ill., 141; *Chew Heong* v. *United States*, 112 U. S., 536.

Where two acts are passed at the same session of the legislature on the same subject, it shows the intent that one is not repealed by the other, but they are to be construed together. *Cuthwright* v. *Crow*, 44 Mo. App., 563; *State* v. *Clark*, 54 Mo., 216; *Commonwealth* v. *Huntley*, 156 Mass., 236. In *Powers* v. *Shephard*, 48 N. Y., 540–544, the court says: "It is hardly to be presumed that the legislature would have repealed an act passed fourteen days before, and if they had intended to do so, they would probably have said so in more appropriate language, and would not have left it to mere inference." *Cheesem* v. *State*, 2 Ind., 149; *Gorley* v. *Sewell*, 77 Ind., 319. It is the duty of the court to avoid a construction, if possible, which leads to manifest injustice. *State* v. *Jaehne*, 103 N. Y., 142.

II. But assuming that the defendant company has, by virtue of the privileges granted to it, obtained all necessary power from the legislature to cross the tracks of the plaintiff company through Fairfield avenue, and has complied with all the conditions required under the charter of the defendant, or the general laws of the State, to permit such crossing, it was argued in the court below, that we still had no right to cross at this point by reason of the fact that the legislature itself, had no power to grant the defendant corporation that privilege, without requiring of the defendant that it should compensate the plaintiff for all possible damage to it, that might arise by virtue of such crossing. In a word, that without compensating the plaintiff, even the legislature had not the right to give the defendant the power to lay its street railway through said Fairfield avenue across the plaintiff's tracks at grade.

This claim of the plaintiff is untenable. Assuming for argument's sake that the plaintiff in fact owned the soil on both sides of Fairfield avenue, and therefore in contemplation of law the fee of the entire street, still the use which the defendant proposes to make of Fairfield avenue is the use of the public,—is the use which every member of the

public has a right to make of the streets and highways in the various towns and cities of the State of Connecticut. A tramway or street railway, when operated by horse, is nothing but an improved mode of conveyance like a stage, omnibus, herdic or bicycle, the right to use which will be presumed to have been fully and completely compensated for, on the original lay-out and taking of the public street, and it is too late, certainly, in the State of Connecticut, to successfully deny this. *Elliott* v. *Fair Haven Railway Co.*, 32 Conn., 579; 2 Beach on Railways, § 808; *Elfelt* v. *Stillwater*, 55 N. W. Rep., 116; *Rafferty* v. *Cent. Traction Co.*, 50 Amer. & Eng. R. R. Cases, 236; *Lockhart* v. *Craig Street R. R. Co.*, 139 Pa. St., 419; *Finch* v. *Arlington R. R. Co.*, 87 Cal., 597 · *Hud. Riv. Telephone Co.* v. *Watervliet T. & R. Co.*, 135 N. Y., 393; *Hinchman* v. *Paterson Horse R. R. Co.*, 17 N. J. Eq., 75. If this is true in regard to adjoining property holders who own the fee, it goes without saying that this particular plaintiff, who claims only an easement, cannot complain of this additional use of the public highway.

The operation of a street railway by electricity instead of by horse power does not in any way change the principles of law, which underlie this question. It does not entitle an adjoining property holder to compensation, by reason of such change in the motive power operating a street railway. This, though a new question in this State, has repeatedly been decided in other States. *Lockhart* v. *Craig St. Railway Co.*, *supra;* Booth on Street Railways, § 83; *Williams* v. *City R. R. Co.*, 41 Fed. Rep., 556; 1 Beach on Pub. Corp., § 664. This is the law in Pennsylvania, New Jersey, Michigan, New York and Rhode Island, constituting abundant authority in support of the defendant's position. See also *Koch* v. *N. Ave. R. R. Co.*, 75 Md., 222, 229; *Du Bois Traction Co.* v. *Buffalo, Rochester & Pittsburg R. R. Co.*, 149 Pa. St., 1.

If this principle of law is true in reference to the tracks and cars of a street railway, it would seem necessarily to follow that the wires and poles used in the operating of an electric road would impose no additional servitude. *Lockhart* v. *R. R. Co.*, 139 Pa. St., 423; *No. Balt. Pass. R. R. Co.* v.

*No. Ave. R. R. Co.*, 75 Md., 223; 50 Amer. & Eug. R. R. Cases, 804, and note; *Halsey* v. *Street R. R. Co.*, 47 N. J. Eq., 380; *Taggart* v. *Newport Street R. R. Co.*, 16 R. I., 668.

It is a well established principle of judicial construction that no Act of the legislature should be declared unconstitutional, unless it is free from all reasonable doubt. *Hartford Bridge Co.* v. *Union Ferry Co.*, 29 Conn., 227; *Lathrop* v. *Stedman*, 13 Blatch., 134; *Leep* v. *St. Louis & Iron Mt. R. R. Co.*, 57 Amer. & Eng. R. R. Cas., 1, 3; *Sinking Fund Cases*, 99 U. S., 718.

Again, it is a well recognized principle of constitutional law, that unless the right granted by the legislature is exclusive the legislature has the right to grant another—substantially the same right, and this, too, without providing for the granting of compensation. This principle is nowhere better established than in this State. *Fitch* v. *N. H., N. L. & S. R. R. Co.*, 30 Conn., 40; *Hartford Bridge Co.* v. *Union Ferry Co.*, 29 id., 210; The famous case of the *Charles River Bridge Co.* v. *Warren Bridge Co.*, 11 Pet., 536, decides this same principle. See also *White River Turnpike Co.* v. *Vermont Central R. R. Co.*, 21 Vt., 590–595.

Furthermore, the right reserved to the State in 20th section of the original charter granted to the plaintiff, to alter, amend or repeal the same at pleasure, preserves to the State the right to grant to the Bridgeport Traction Company, or any other traction company, or any other railroad the right to cross the tracks of the plaintiff railroad at grade. *English* v. *Northampton R. R. Co.*, 32 Conn., 240; 2 Morawetz on Corp., § 1094; General Statutes, § 1909; *N. Y. & N. E. R. R. Co.* v. *Railroad Comrs.*, 62 Conn., 538; Cooley, Const. Lim., 342.

III. Even if the charter of the plaintiff company was a close charter, we submit that the legislative power granting the Traction Company the right to cross its road at grade would be legal, as the exercise of a police power. 8 Amer. & Eng. Ency. of Law, 621, 622; *Stone* v. *Miss.*, 101 U. S., 817; *Boyd* v. *Alabama*, 94 U. S., 645; *Beer Co.* v. *Massachusetts*, 97 U. S. 25; *Stone* v. *Farmers' Loan & Trust Co.*,

116 U. S., 307; *Barlow* v. *Gregory*, 31 Conn., 261; *Baker* v. *Boston*, 12 Pick., 184. That railroads and highways are of such public character, especially where they cross each other, as to be subject to public supervision, cannot be questioned, especially in this State, in view of the recent legislation and the numerous cases tried and being tried in our courts. *Woodruff* v. *Catlin*, 54 Conn., 295; *Westbrook's Appeal*, 57 id., 104; *N. Y. & N. E. R. R. Co.* v. *Railroad Com'rs*, 59 id., 65; *State's Attorney* v. *Branford*, 59 id., 402; *N. Y. & N. E. R. R. Co.* v. *Waterbury*, 60 id., 9.

Moreover, the General Assembly, as *parens patriae*, has the undoubted power to enact the legislation in this State under which the defendant claims its rights. *Wheeler's Appeal*, 45 Conn., 306; *Calder* v. *Bull*, 3 Dall., 386.

IV. It appears that when the defendant applied to the railroad commissioners they refused to proceed under chapter 208 of the Pub. Acts of 1893, on the ground that they had no jurisdiction. From this decision it was the duty of the plaintiff to appeal if aggrieved. Not having done so the question of approval or disapproval of the railroad commissioners is now *res adjudicata* between the parties. *Regina* v. *Yorkshire*, Ad. & E. N. S., 625; *Morgan* v. *Plumb*, 9 Wend., 287; *People* v. *Smith*, 51 Barb., 360; 1 Freeman on Judgments, § 267; 1 Herman on Estoppel & Res Adjudicata, §§ 115, *et seq.*

V. Assuming it possible that the legislature intended, by enacting that chapter 208 should become operative July 30th, 1893, to repeal those provisions of the defendant's charter in reference to grade crossings, we submit that a grave question of constitutional law arises as to whether the legislature had the right to pass such an enactment. In the defendant's charter, or rather in the charter of the East End Railway Company, to whose rights the defendant succeeded, it is expressly provided as follows: "When said railway company (that is, the street railway company) shall abandon its present crossing with its tracks at grade with the N. Y., N. H. & H. R. R. Co., at Seaview avenue in the city of Bridgeport, it may cross the tracks of said steam railroad at grade at or near

the junction of Fairfield avenue and Stratford avenue at the southerly end of the railroad station of said steam railroad in the city of Bridgeport."

And the finding shows, "that the defendant has merged and consolidated with and succeeded to all the rights of the East End Railway Company, and has since such consolidation abandoned its crossing at grade over the railroad tracks of the plaintiff at Seaview avenue in said city of Bridgeport." Is there not here, not only a contract in that it has been executed on the part of this defendant, and because executed, incapable of being impaired, but also a contract in the strictest sense of that word based on a consideration? Is it not taking away the defendant's rights without due process of law? *Fletcher* v. *Peck*, 6 Cranch, 87; Cooley's Const. Lim. (3d Ed.), 273, 274, and cases cited in notes; *Piqua Bank* v. *Knoop*, 16 How., 369; *Trustees of Wabash and Erie Canal* v. *Beers*, 2 Black, 448; *Planters' Bank* v. *Sharp*, 6 How., 301; *The Binghamton Bridge*, 3 Wall., 51; *New Jersey* v. *Wilson*, 7 Cranch, 164; *Landon* v. *Litchfield*, 11 Conn., 251; *New Jersey* v. *Yard*, 95 U. S., 104.

*Goodwin Stoddard* and *Wm. D. Bishop, Jr.*, for the (plaintiff).

I. Under the law of this State the defendant has not the right to cross the railroad tracks of the plaintiff, at grade, at said Fairfield avenue crossing, except upon application to and approval by the railroad commissioners.

Special Acts, 1893, pp. 878, 879, provides that " when said railway company (East End Railway Company) shall abandon its present crossing with its tracks at grade with the New York, New Haven & Hartford Railroad Company, at Seaview avenue in the city of Bridgeport, it may cross the tracks of said steam railroad at grade at or near the junction of Fairfield avenue and Stratford avenue, at the southerly end of the railroad station of said steam railroad in the city of Bridgeport." This Act was approved on June 28th, 1893, and took effect on that day. Public Acts of 1893, Chap. 208, reads as follows: " Chapter CLXVIII. of the public acts of

1889 is hereby amended to read as follows : No electric, cable or horse railroad shall hereafter be constructed across the tracks of a steam railroad at grade, except upon application to and approval by the railroad commissioners, nor shall any steam railroad cross any such electric, cable or horse railroad at grade, except upon like application and approval." This Act was approved on June 14th, 1893, and took effect thirty days from June 30th, 1893.

The plaintiff claims that these two acts should be construed together, and that so construed, the right of the defendant, as successor to the East End Railway Company, to construct the crossing in question does not become absolute until and unless it shall have secured the approval by the railroad commissioners thereto.

Even a superficial examination of the statutes of this State cannot fail to convince the casual observer that the legislature of this State has ever been singularly astute and vigilant in its efforts for the preservation of public safety at crossings of highways and railroads, and of railroads with other railroads, and, generally, in all matters involving the reciprocal rights of public travel by road and rail, and the necessary perils incident to the exercise of such rights. It is worthy of notice, also, that whenever the legislature has felt a doubt as to the propriety of imposing absolute restrictions, and has deemed it wise that a rule of that character should have its limitations and exceptions, it has almost invariably intrusted to the railroad commissioners the duty of ascertaining and deciding whether an exception to the general rule should be permitted.

Nor has the judicial branch of our government been silent on this important subject. *Dyson* v. *R. R. Co.*, 57 Conn., 21 ; *N. Y., etc. R. R. Appeal*, 58 Conn., 540 ; *Railroad Co.* v. *Waterbury*, 60 Conn., 9 ; *N. Y., etc. R. R. Appeal*, 62 Conn., 534.

The plaintiff submits that the Public Act of 1893 requires the defendant to apply to and obtain the approval of the railroad commissioners, to enable it to cross Fairfield avenue crossing at grade.

In view of the extreme danger of grade crossings of this character, and in view of the fact that it is the province and duty of the legislature, as part of its police power, to conserve the safety of the public, and to forbid those acts that may imperil its safety, we should not hesitate to urge this court that the long settled policy of this State, and a proper regard for the safety of its citizens, would require it to adopt the doctrine laid down in 8 Amer. & Eng. Ency. of Law, p. 621, and hold that " The legislature cannot bargain away the police power of the State."    But the exigencies of this case do not require a consideration of it from that point of view, for the General Act of 1893 is conclusive evidence that the legislature, so far from bargaining away the police power of the State, has exercised it in a manner in perfect accord with the policy of the State, and in complete harmony with previous legislation on kindred subjects.    It has done as its predecessors have ever done, *i. e.*, placed in the hands of its own officers, the railroad commissioners, the duty of ascertaining and determining whether a crossing at grade, might, with safety to the public, be permitted.

The defendant's charter authorizes it to cross at grade, and provides, that, " Except as otherwise herein expressly provided, this charter shall be subject in all its parts to the general laws relating to street railways and street railway companies." The general law makes the exercise of that authority dependent upon the approval of the railroad commissioners.    If the general law of 1849 restricted the authority conferred upon railroads by their charters, which has never been questioned, upon what principle can it be claimed that the general law of 1893 does not have a similar effect upon the authority granted the defendant by its charter?

The authority conferred upon it by its charter can be modified and restricted by the general law.    *Southport* v. *Ogden*, 23 Conn., 128; *People* v. *Jaehne*, 103 N. Y., 195; *Penn. R. R. Co.* v. *Braddock Electric Ry. Co.*, 152 Pa. St., 116.

The important question which now presents itself is whether the legislature in passing the general Act of 1893, intended to so restrict the exercise of the power granted by the de-

fendant's charter, as to require application to and approval by the railroad commissioners. It is unquestionably true that the general Act of 1893, though approved on June 14th, 1893, did not take effect until thirty days from June 30th, 1893, upon which latter date the Act fixing the time when the Public Acts of 1893 should take effect, was approved and went into effect. Our legislature will be presumed to have known the law in this regard, and to have regulated its conduct in view of such knowledge; and the natural result would be, under ordinary circumstances, to regard the general Act as an additional exercise by the legislature of the power already exercised by it, with reference to the defendant. Unless some important reasons can be suggested why the ordinary rules of statutory interpretation should not be applied in this case, it is difficult to conclude otherwise than that the provisions of the general Act were intended to modify those of the special Acts, and to restrict the authority therein granted, to the extent of requiring application to and approval by the railroad commissioners. Both Acts are *in pari materia;* both were passed at the same session; and that effect should be given to both which is in accord with the settled policy of the State, rather than that which, it must be admitted, completely revolutionizes that policy.

II. The defendant cannot construct the crossing in question, without at least first making compensation for the direct damage done to the property of the plaintiff.

The property of the plaintiff, impaired or destroyed by the defendant, consists not only of its tangible and corporeal property, but also of its franchise. "The term franchise," says JUDGE BUTLER, in *City of Bridgeport* v. *Railroad,* 36 Conn., 266, "has several significations, and there is some confusion in its use. The better opinion deduced from the authorities seems to be that it consists of the entire privileges embraced in and constituting the grant." "Certain corporate franchises," says CHIEF JUSTICE RUGER, in *People* v. *O'Brien,* 111 N. Y. 40, "have been uniformly regarded as indestructible by legislative authority and as constituting property in the highest sense of the term." The value of the plaintiff's fran-

chise consists in being permitted to operate its two hundred trains a day over the location in question, carrying its passengers, freight and the United States mails safely and expeditiously.

A grant to any person or corporation which prevents such operation of the plaintiff's railroad, impairs its franchise and thereby takes its property. *Enfield Toll Co.* v. *Conn. River Co.*, 7 Conn., 47.

The acts of the defendant constitute "a taking" within the modern definition of that term. The rule is now firmly established that property may be taken within the meaning of this constitutional provision, although the title and possession remain undisturbed; to deprive the owner of the ordinary beneficial use and enjoyment of his property, is in law equivalent to the taking of it, and is as much a taking as though the property itself was actually taken. Lewis on Eminent Domain, § 56; Tiedeman on Limitation of Police Power, 397; Cooley on Const. Lim. (6th Ed.), 670; *Vanderlip* v. *City of Grand Rapids*, 73 Mich., 522, (where many of the cases are reviewed at length); *Rigney* v. *City of Chicago*, 102 Ill., 64; *Hooker* v. *New Haven etc.*, 14 Conn., 146. The finding is that the prohibited act of the defendant "impairs the property of the plaintiff, interferes with the accustomed and necessary operation of its road and endangers the lives of its passengers and employees." How can it be claimed that an invasion of the property and rights of the plaintiff which must necessarily produce so serious a result is not a "substantial impairment" of the object for which the plaintiff was incorporated, and therefore not within the power of condemnation? *Commissioners, etc.*, v. *Holyoke, etc.*, 104 Mass., 446; *Holyoke* v. *Lyman*, 15 Wall., 500; *Citizens Co.* v. *Bridgeport Hydraulic Co.*, 55 Conn., 1.

It is not necessary to discuss whether a street railway is an additional burden upon the highway in the general acceptation of the phrase, (the affirmative of which proposition is generally supposed to have been sustained in *Imlay* v. *Union, etc. Railway*, 26 Conn., 249,) but it is claimed in this case that the construction of its road by the defendant, and the oper-

ation of its ponderous, powerful and swift-running cars upon double tracks over and on the tracks of the plaintiff at grade, resulting in the impairment of the property of the plaintiff, interfering with the necessary operation of its road, and endangering the lives of its passengers and employees, is such an invasion of its rights and property as entitles it to just compensation. *Memphis & Charleston R. R. Co.* v. *Birmingham etc. R. R. Co.*, 96 Ala., 571; 6 Amer. & Eng. Ency. of Law, p. 542; *Pumpelly* v. *Canal Co.*, 13 Wall., 166; *Chicago & Alton R. R. Co.* v. *Springfield & N. W. R. R. Co.*, 67 Ill., 147; *Peoria & P. U. Ry. Co.* v. *Peoria & F. Ry. Co.*, 10 Amer. & Eng. R. Cas., 129; *Lake Shore & M. S. R. Co.* v. *Cincinnati S. & C. R. Co.*, 30 Ohio St., 604; *Kansas City Suburban Belt R. Co.* v. *Kansas City etc. R. Co.*, 118 Mo., 599; *S. C.*, 57 Amer. & Eng. R. Cas., 624.

BALDWIN, J. The plaintiff's complaint is in the nature of a pure injunction bill. It avers that it sends about two hundred regular trains of cars daily, some of which carry the mails of the United States, and the rest passengers and freight, across Fairfield avenue in the city of Bridgeport, at grade; that the defendant threatens to obstruct the plaintiff's right of way by forcibly laying tracks for an electric railway over said crossing and upon the plaintiff's tracks; and that if such new tracks are so laid and used, it will seriously impair the plaintiff's power to fulfill its chartered purposes, disarrange its train service, put it to great additional expense in the operation of its road, and greatly endanger the lives of the passengers and employees on all trains crossing such avenue. The defendant's answer admits the character and extent of the plaintiff's business, as alleged, but sets up a grant by the last General Assembly of express authority to construct the crossing in question, at grade.

It appears by an agreed statement of facts (made subject to the opinion of the court as to their relevancy) that Fairfield avenue was a public highway long before the plaintiff's railroad was constructed, and that the proposed crossing by the defendant's railway "impairs the property of the plain-

tiff, interferes with the accustomed and necessary operation of its road, and endangers the lives of its passengers and employees. But the defendant does not intend to injure the property of the plaintiff, or interfere with the accustomed and necessary operation of its road, or endanger the lives of its passengers, and will not, except such as naturally follows from the location and operation of its trolley road across the tracks of the plaintiff at grade."

These facts are relevant and material to the issue. They show that the proposed crossing, if constructed, will interfere with the necessary operation of the plaintiff's road, and endanger the lives of all whom it transports across Fairfield avenue in the two hundred trains which daily pass there. It would be difficult to make out a stronger case for the interposition of a court of equity, if it has the power to interpose. Only by an injunction can the defendant be prevented from setting up across the tracks of a steam railroad in constant use, an obstruction of a continuing character, which would daily put in peril hundreds or thousands of human lives.

It is argued that the plaintiff's claim is in substance simply one for an injunction against threatened trespasses, or repeated obstructions of a right of way, and that it is not claimed that the defendant is not pecuniarily responsible for any damage it may do, nor that the plaintiff will be exposed to irreparable injury. But the plaintiff holds its right of way charged with the performance of a public trust for its continuous use for public accommodation. *Gates* v. *Boston & New York Air Line R. R. Co.*, 53 Conn., 333, 341, 343. Its railroad is a great avenue of communication between one part of the State and another, and between this and other States. Any impediment to its safe and proper use is a matter of public concern, not to be measured by money, or dealt with on the footing of a claim for damages.

If erected without authority from the State, it may be that the State's attorney might properly sue for an injunction; but the same remedy would be open to the plaintiff, for it suffers a special injury, and is charged by the State with a

special duty of maintaining its road at this crossing in uninterrupted use under safe conditions. *Borough of Stamford v. Stamford Horse R. R. Co.*, 56 Conn., 381, 395; *Frink v. Lawrence*, 20 Conn., 120.

As the plaintiff has stated a case sufficient to support its action, we are brought to the consideration of the merits of the defense founded on a legislative grant.

In June, 1893, the East End Railway Company owned and operated a horse railroad in Bridgeport and Stratford, under a charter granted many years before, which railroad crossed the tracks of the plaintiff's railroad at grade, upon a highway known as Seaview avenue. By an amendment to this charter, approved June 28th, 1893, it was authorized to extend its lines in each town by laying tracks through certain designated streets, " and also from Stratford avenue on and along Pembroke street, across the tracks of the New York, New Haven and Hartford Railroad Company at grade, until said tracks are elevated, to Old Mill Green ; subject to such regulations and restrictions as to said railroad crossing as the board of railroad commissioners may at any time order upon the application of either of said companies ; and from the lower bridge westerly, over and under the tracks of said railroad to the junction of Fairfield avenue and Water street; provided, however, that when said railway company shall abandon its present crossing with its tracks at grade with the New York, New Haven and Hartford Railroad Company at Seaview avenue, in the city of Bridgeport, it may cross the tracks of said steam railroad at grade at or near the junction of Fairfield avenue and Stratford avenue, at the southerly end of the railroad station of said steam railroad in the city of Bridgeport; subject, however, to such regulations and restrictions as the railroad commissioners may at any time order upon the application of either of said companies ; and from the junction of Fairfield avenue and Water street southerly along Water street, westerly to Main street ; * * * also from the northerly terminus of the line of said horse railway on East Main street across the tracks of the New York, New Haven and Hartford Railroad Company at grade, until said

tracks are elevated, to the north side of East Washington avenue; subject, however, to such regulations and restrictions as the railroad commissioners may at any time order, upon the application of either of said companies." Special Acts of 1893, pp. 878, 879. This amendment also empowered the company to equip and operate its road with electric power, and to consolidate and make common stock with any other street railway company having lines in Bridgeport, or to transfer to it its property and franchises.

A horse railroad had been in operation in Bridgeport for many years, owned by the Bridgeport Horse Railroad Company. By an amendment to its charter, approved June 28th, this company was authorized to consolidate with any other street railway company; to equip its lines with electric power; and to extend them through various streets, among which were Congress street " across the railroad tracks of the New York, New Haven and Hartford Railroad Company at grade, until said grade crossing is abolished by the steam railroad company; * * * subject to such regulations and restrictions in the matter of crossing the tracks of said steam railroad at grade as the railroad commissioners may at any time make upon the application of either of said companies;" and also North avenue, Broad street, Lafayette street, South avenue, and "Fairfield avenue in the western section of said city," each of which five streets was crossed by the plaintiff's steam railroad at grade, and in respect to each of which, the company was empowered to construct a grade crossing over such steam railroad, in the same words used regarding the Congress street crossing, and subject to the same restrictions.

On the same day, the Bridgeport Railway Company was chartered, with power to construct and operate an electric railway through certain streets in Bridgeport; to cross the tracks of any steam railroad, at grade, under such regulations and restrictions as the railroad commissioners should establish for the safety of the public; to acquire all the rights and franchises of the East End Railway Company, and of the Bridgeport Horse Railroad Company; and to become consolidated with them by the name of the Bridgeport Traction

Company. The concluding section of this charter ran thus: "Except as otherwise herein expressly provided, this charter shall be subject in all its parts to the general laws relating to street railways and street railway companies." Special Acts of 1893, § 19, p. 877. The amendment to the charter of the Bridgeport Horse Railroad Company also contained substantially the same provision.

The consolidation and transfer of franchises thus authorized was duly made prior to August 16th, 1893.

By a Public Act, which took effect on June 1st, 1893, (Public Acts of 1893, p. 307,) it was enacted that no street railway company already existing or thereafter incorporated, should lay new tracks in any city, until its plan of construction and operation had been approved by the mayor and court of common council. Soon after the consolidation, the defendant, as owner of the rights and franchises of each of the three companies so consolidated, presented its plan of construction and operation (which involved the abandonment of the Seaview avenue grade crossing, and the laying of a double track on Fairfield avenue, to cross the plaintiff's railroad at grade by means of electric power supplied to a trolley from overhead wires) to the mayor and court of common council of Bridgeport, and it was duly approved.

On June 14th, 1893, a Public Act was passed (Public Acts of 1893, p. 361, Chap. CCVIII.) amending Chap. CLXVIII. of the Public Acts of 1889, so as to read as follows: "No electric, cable, or horse railroad shall hereafter be constructed across the tracks of a steam railroad at grade, except upon application to and approval by the railroad commissioners, nor shall any steam railroad cross any such electric, cable, or horse railroad at grade, except upon like application and approval." By another Act, approved June 30th, it was enacted that all the Public Acts of the session, unless otherwise provided, should take effect thirty days from the rising of the General Assembly. The Assembly rose on June 30th.

On August 16th, the defendant, after having abandoned the grade crossing at Seaview avenue, applied to the railroad commissioners for permission to construct the tracks of its

" horse railroad " at grade across the plaintiff's railroad on Fairfield avenue, under such regulations and restrictions as the commissioners might approve. The application was afterwards amended by adding a request that they would establish, pursuant to the charter of the Bridgeport Railway Co., such regulations relative to such crossing of the two railroads at grade, as they should see fit for the safety and protection of the public. The commissioners decided that the General Assembly had given the defendant the right to cross, and that they had no jurisdiction to approve or disapprove the proposed crossing; but proceeded to establish certain regulations as to the manner of its construction and operation.

The main contention of the plaintiff is that the Public Act of June 14th, which took effect July 30th, repealed or modified those parts of the special grants, made on June 28th, (when the Private Acts took effect under the provisions of the General Statutes), under which the defendant claims an absolute right to construct the crossing in question.

The doctrine that a later statute repeals by implication all provisions of former ones which are inconsistent with it, rests on the ground that the last expression of the legislative will ought to control. It assumes that there have been successive and different expressions of such will, in relation to the same subject; and the latest of these governs, precisely as the last word of a master governs his servants, however much it may vary from his previous directions. Such is presumed to be his intention; and the intent of a statute is determined by the same rule and the same reason.

The General Assembly, on June 14th, provided that no street railway should thereafter be constructed across a steam railroad at grade, except upon application to and approval by the railroad commissioners. By the general laws then existing (Public Acts of 1889, Chap. XXIX) this Act would have taken effect on the first day of July following the rising of the Assembly; but on June 30th, the time when it went into operation was postponed to July 30th. The Act of June 14th was designed, either to change the general laws as to the crossing of steam railroads by street railways, or to

make clear their meaning. In either case it was intended to remove impediments to the construction of such crossings. It declared it to be the general policy of the State that such crossings might be made with the approval of the railroad commissioners, and not otherwise.

On June 28th, the Assembly granted permission for the construction of certain crossings of this kind in a particular city. These grants must have been based on petitions which sought permission to construct street railways on the streets in question, and were brought on due notice to the public and all parties adversely interested. General Statutes, §§ 388, 392, 393. The attention of the legislature was specially directed to the railroad problem in Bridgeport, and it decided to give the defendant and its predecessors in title power, after abandoning the Seaview avenue crossing, to lay tracks across those of the plaintiff on Fairfield avenue, at grade, upon such plan of construction and operation as the city authorities should approve, subject only to such regulations and restrictions as the railroad commissioners might order, on the application of either company.

There can be no question that the defendant could have proceeded to make this grade crossing, after the fulfillment of the three preliminaries above mentioned, at any time between June 28th and July 30th, notwithstanding the passage of the Public Act of June 14th. *Powers* v. *Shepard,* 48 N. Y., 540, 545. To say that that Act, on July 30th, imposed the new restriction which is claimed, upon the exercise of the defendant's franchises, is virtually to make it nullify the special grants obtained after its enactment, so far as they relate to grade crossings of steam railroads.

On July 30th, the defendant, had its charter contained no provision on the subject, other than the permission to extend its lines through Fairfield avenue, could have constructed the crossing in question, under the general law, upon obtaining the approval of a crossing at that place by the railroad commissioners, and of the method of constructing and operating it, by the mayor and court of common council. By the general law (Public Acts of 1893, p. 308,

§ 3), the city authorities have "exclusive direction over the placing or locating of any tracks, wires, conductors, fixtures," or structures by any electric railway company in the highways of the city, "including the power of designating the material, quality, and finish thereof," and "may make all orders necessary to the exercise of such power of direction and control." If, then, all these general laws affect the defendant, and it is also bound by the provisions of its charter, its construction of the crossing in question must, in any case, be subject to the regulations of the city and also of the railroad commissioners, as to methods of construction and operation. But other companies, laying tracks without any special privileges as to the mode of construction, across a steam railroad at grade, would have nothing to do with the railroad commissioners, except to get their approval of the crossing; the regulation of the mode of constructing and using it being left to be determined by the municipal authorities exclusively. Unless, then, the defendant is exempted by its charter from recourse to the railroad commissioners for the approval of this crossing, it is in a worse condition than if its charter had been silent on the subject; for as to modes of construction it is subject to two masters, instead of one.

"A special and local statute, providing for a particular case, or class of cases, is not partially repealed or amended, as to some of its provisions, by a statute general in its terms, provisions, and application, unless the intention of the legislature to repeal or alter the particular law is manifest; although the terms of the General Act would, taken strictly, and but for the special law, include the case or cases provided for by it." *Matter of Commissioners of Central Park*, 50 N. Y., 493, 497. Where a special charter is followed by general legislation on the same subject, which does not in terms, or by necessary construction, repeal the particular grant, "the two are to be deemed to stand together: one as the general law of the land, the other as the law of the particular case." *State* v. *Stoll*, 17 Wall., 425, 436.

The defendant's charter expressly contemplates and regu-

lates the effect of general legislation inconsistent with its provisions, by the declaration with which it concludes, that it is to be subject to the general laws relating to street railways, "except as otherwise herein expressly provided." The "general laws" intended must have been both thóse then in force and those which might come into force thereafter. The Act of June 14th was one of the latter class. It required electric railway companies generally to obtain the approval of the railroad commissioners before constructing a grade crossing upon a steam railroad. But, as respects the grade crossing at Fairfield avenue, the charter of the defendant had expressly provided otherwise, for it had given explicit and full permission for the construction of this crossing, whenever that at Seaview avenue should be abandoned.

The general police power of the State resides in the General Assembly. It can forbid grade crossings of highways by railroads or of one railroad by another, at any particular place. *Woodruff* v. *Catlin*, 54 Conn., 277, 295. It can, by the same authority, permit them at any particular place, conditionally or unconditionally.

By an amendment to the charter of the State Street Horse Railroad Company, approved June 23d, that company was authorized (Special Acts of 1893, p. 846) to equip its lines with electric power, and to extend them through certain streets in Fair Haven, " or said company at its option may lay its tracks and operate its cars across the tracks of the Shore Line Railroad on Ferry street until said tracks of the Shore Line Railroad are removed; provided, that during said time this company place a watchman at said railroad crossing at its own expense; " and it was declared that the Act should be subject in all its parts to the general laws relating to street railways "except as otherwise expressly provided herein." In this instance also, therefore, the legislature, in regard to a designated crossing, exercised its own judgment as to the expediency of allowing its construction at grade, and the mode of regulating its use, when constructed, so as to secure public safety; thus expressly pro-

viding for a course of proceeding, as to a particular locality, differing from that prescribed by the general laws.

The plaintiff contends that the number of grade crossings of steam railroads, apparently authorized by the various charters and amendments of charters to which reference has been made, is so great·as to raise a necessary presumption that the General Assembly must have intended them to be subject to the approval of the railroad commissioners, under the general law, previously enacted, and subsequently taking effect.

It is true that grade crossings of highways by steam railroads have repeatedly been pronounced by this court to be dangerous to human life, and that the general policy of the legislature for a considerable period of years has been to secure their abolition as speedily as it can reasonably be effected. *Dyson* v. *New York and New England R. R. Co.*, 57 Conn., 21; *New York and New England Railroad Company's Appeal*, 62 Conn., 527, 540; 151 U. S., 555. But the special legislation, now under consideration, does not increase the number of such crossings. It increases, no doubt, the danger of their use; but if, notwithstanding this, the General Assembly has seen fit to make the grants relied on, they must be construed like every other statute, according to the intention which they express, rather than that which might perhaps have been anticipated, in view of the course of previous legislation. The frequent references, indeed, to the temporary character of most of the proposed crossings, as that they are to continue until the steam railroad tracks are removed, or elevated, may be some indication that the legislature thought the very construction of the electric railway tracks across those of the steam railroad might be an incentive to the speedier removal of the latter from the surface of the highway.

The plaintiff urges that the State cannot bargain away its police power, and that any permission, however explicit and unqualified, to construct a dangerous crossing may be modified or repealed as soon as it is given. This is undoubtedly true. *Pennsylvania Railroad Co.* v. *Braddock Electric Rail-*

*way Co.*, 152 Pa. St., 116, (25 Atlantic Rep., 780). But the
question before us is not whether there was a right of repeal,
but whether such a right was exercised.

We think that there is no sufficient ground for the conten-
tion that it was the intent of the legislature, by the Public
Act of June 14th, to repeal the special and local grants not
yet made, under which the defendant claims, and which were
afterwards inserted in the Private Acts of June 28th. The
case falls within the rule, *Generalia specialibus non derogant.*

It is further insisted that these special grants, if otherwise
effectual, give the defendant no right to construct the cross-
ing without first making compensation for the direct damage
it will do to the plaintiff's property.

The injunction was asked to prevent a threatened obstruc-
tion of the plaintiff's "right of way." It is not alleged or
found that it owns the fee of the highway. It has only a
right to cross it at grade.

The defendant's tracks are laid upon the highway by the
authority of the State, and as a mode of rendering it more
serviceable as a highway for public travel. We are not called
upon to consider whether electric car tracks impose any ad-
ditional burden upon land occupied for a highway, for which
the owner of such land can claim compensation. The plain-
tiff is not in a position to raise that question. It claims that
the proposed crossing at Fairfield avenue will affect the safe
and beneficial use of its right of way, at that point, and there-
by impair the general value of its franchises and property.
But it holds these subject to the police power of the State,
under which the use of highways for all purposes of public
travel is fully within the control of the legislature. *Elliott
v. Fair Haven & Westville Railroad Co.*, 32 Conn, 579, 582.
The same authority which can make it lawful for electric
railways to cross, at grade, any and every highway intersect-
ing the street upon which their tracks are laid, can make it
lawful for them to cross, at grade, any and every steam rail-
road intersecting that street. To raise or depress the street,
or the structure bearing the electric tracks, so as to carry it
above or beneath the steam railroad, might, in a particular

case, cause more inconvenience or even danger to the traveling public than it would avoid. The failure of a brake upon an electric car to act would naturally cause more peril to the passengers, and to those traveling on the street, if the car were, at the time, on an up or down grade. The difficulty of hauling heavy loads increases with every considerable ascent or descent in the highway. To divert the electric tracks from the street, in order to effect a crossing of a steam railroad elsewhere, necessarily leaves part of such street unsupplied with the facilities for quick communication which it might otherwise enjoy. To stop the electric cars on each side of the steam railroad, for the transfer of their passengers on foot from one car to another, involves them in personal inconvenience and delay, and without absolutely freeing them from the danger of being struck by a passing train.

. The approval given in behalf of the State to the location of the plaintiff's railroad across Fairfield avenue, made it lawful to construct and use the crossing at grade; but it conferred no greater power to control the use of the highway by others, than any individual traveler possesses. The company could not use the highway without legislative authority, but its rights of passage are not superior in kind to those of the individual, who needs no such authority, or to those of any other corporation which the State may authorize to use it for purposes of travel.

The legislature has deemed it proper to allow the construction of electric railways in certain streets of the city of Bridgeport. It was bound to regard the safety and convenience of those who were to ride upon them, as well as the safety and convenience of those who were to ride over the steam railroads already laid upon those streets. In full view of the danger attending a grade crossing of the plaintiff's by the defendant's road on Fairfield avenue, it has deemed it for the public interest to permit its construction; and it was no more bound to provide for compensation to the plaintiff, for the injury it may suffer, than to provide for it in favor of any individual who may have occasion to cross the defendant's tracks, at the hazard of a possible collision with its cars.

*Bridgeport* v. *N. Y. & N. H. R. R. Co.*, 36 Conn., 255, 267, 268; *Massachusetts Central R. R. Co.* v. *Boston, Clinton and Fitchburg R. R. Co.*, 121 Mass., 124; *Metropolitan Railroad Co.* v. *Highland Street Railway Co.*, 118 Mass., 290; *New York and New England Railroad Company* v. *Waterbury*, 60 Conn., 1.

The plaintiff took the risk of suffering such an inconvenience or peril, when it elected to build its road over Fairfield avenue at grade. Such a crossing, in the center of a busy city, was a source of danger before the defendant's charter was granted. Had it been constructed above grade, no use of the street by the defendant could have impaired the value or safety of the plaintiff's road. The defendant's charter does not create a danger so much as increase a danger; and as it is one incident to the lawful use of the highway, the plaintiff suffers nothing which it should not have contemplated as possible when it made its original location, and nothing to which such a location did not necessarily make it subject. The impairment of its property, the interference with the accustomed and necessary operation of its road, and the danger to the lives of those whom it transports, present simply a case of *damnum absque injuria*.

It was claimed by the defendant that the grant to the East End Railway Company of permission to construct this crossing at grade, when it should abandon the grade crossing then existing at Seaview avenue, the acceptance of this charter amendment, and the abandonment of that crossing, show an executed contract between the State and the defendant, as the successor to the original company, the obligation of which could not be impaired by subsequent legislation. It is unnecessary to inquire whether such a claim would be tenable, since it does not appear that the Seaview avenue crossing was abandoned before the Act of June 14th came into effect.

There is error and the judgment of the Superior Court is reversed.

In this opinion TORRANCE and FENN, Js., concurred; ANDREWS, C. J., and HAMERSLEY, J., dissented.

HAMERSLEY, J. (dissenting). It has become the settled policy of this State that the intersection of a railroad and highway at grade is a dangerous public nuisance that should be abated as rapidly as possible. *Dyson* v. *N. Y. & N. E. R. R. Co.*, 57 Conn., 21; *N. Y. & N. E. R. R. Co.'s Appeal*, 62 Conn., 540. If this is true of a railroad crossing a highway how much more true is it of one railroad crossing another. The latter crossings were not sufficiently numerous to call for general legislation until 1882, when it was enacted that "no railroad shall cross any other railroad at grade without the consent and approval of the railroad commissioners." Public Acts, 1882, p. 215. And in the following year it was enacted that such consent and approval should not be given unless the commissioners should find the avoidance of grade crossing to be impracticable. These laws are now in force.

Until about 1889 horse railroads were the only street railroads, and were mainly used in highways that did not cross railroads at grade, and were treated as a part of the highway, requiring no special legislation as to crossings; but when the electric railroad became an accomplished fact and threatened to occupy highways, it became evident that the intersection at grade of an electric and steam railroad might be as dangerous, as such intersection by two steam railroads, or even more dangerous. And so in 1889 the legislature treated electric railroads (including also cable and horse railroads) in respect to grade crossings substantially as steam railroads had been treated, and provided that there should be no intersection of such railroads without application to and approval by the railroad commissioners; and this law was re-enacted in 1893. It is thus apparent that the intersection at grade of the tracks of a steam railroad and an electric railroad is by law a nuisance highly dangerous to human life; and that any legislative permission to maintain such a nuisance must be exceptional and contrary to the general policy of the State as expressed by the legislative and judicial departments.

The defendant claims that its charter granted at the session of 1893, gives it express permission to establish this nuisance and to cross the tracks of the plaintiff at grade,

without application to and approval by the railroad commissioners. Its charter does say that the defendant may cross the plaintiff's tracks at grade; but it does not in express terms authorize the defendant to construct such crossing without application to and approval by the railroad commissioners; and the question at issue is, does the right given to cross at grade imply a permission to exercise such right in violation of the general law which declares that no such right shall be exercised without application to and approval by the railroad commissioners. In passing on the question it should be remembered that "charters of corporations which confer exclusive privileges for the particular advantage of the grantees are to be construed liberally for the benefit of the public; and strictly as against the corporation. *Burritt* v. *New Haven*, 42 Conn., 202. And this principle should be applied with the most strictness where an exception from the public law is claimed that is inconsistent with the settled policy of the State, and may prove a constant menace to the lives of thousands of its citizens.

The Act of 1893 forbidding the construction of any intersecting tracks, at grade, except on application to the railroad commissioners, went into effect after the rising of the General Assembly of that year, and operated as the last expression of the legislative will on all antecedent laws relative to the same subject, and therefore upon the charter of the defendant. I do not deem it material whether this Act did or did not alter the legal effect of the prior Act of 1889— the question may be doubtful—but in either case, in the view I take of the legislation of the session, the Act was, and was intended to be, the last expression of the legislative will on that subject.

The defendant, however, claims that it does not modify the exercise of any right granted by its charter, because such modification would be a repeal of its charter by implication, and such repeals are not favored by law. As to the soundness of this principle there can be no question, but it does not apply to this case. The principle is accurately stated in *Goodman* v. *Jewett*, 24 Conn., 589: "It (the later law)

does not in terms repeal the law of 1853 or any part of it, nor does it impliedly repeal the fifth section of it by force of the principle that later statutes abrogate prior contrary statutes. That maxim applies only when the *later* statute is couched in negative terms, or when its provisions are so clearly repugnant to the former Act that it necessarily implies a negative. 1 Blackstone Comm., 89. If both statutes can be reconciled, they must stand and have a concurrent operation." See also *Norwich* v. *Story,* 25 Conn., 47; *Kallahan* v. *Osborn,* 37 Conn., 490.

In this case the later statute is couched in negative terms. "No electric railroad shall hereafter be constructed across the tracks of a steam railroad at grade." The two statutes cannot be reconciled. The repugnancy is direct and does not depend upon any implied inconsistency. The maxim that a later statute abrogates a prior contrary statute applies; and the principle invoked by the defendant has no application.

Again, the defendant claims that a special and local statute providing for a particular case is not repealed by a statute general in its terms, provisions and application, unless the intention to repeal the particular law is manifest; although the terms of the general Act, taken strictly, and without reference to the special Act, would include the case provided for by that Act; and further claims that where a special charter is followed by general legislation on the same subject, which does not in terms or by necessary construction repeal the particular grant, the two are to be deemed to stand together; one as the general law of the land and the other as the law of the particular case.

The principle here advanced, as a general rule of construction, is unquestionable. The difficulty lies in its application to the defendant's case. The special Act says: "The defendant may cross the tracks of the plaintiff's steam railroad at grade at the junction of Fairfield and Stratford avenues;" the general act says: "No electric railroad shall hereafter be constructed across the tracks of a steam railroad at grade, except upon application to and approval by

the railroad commissioners." Can it fairly be said that the intention of the legislature to affect the particular law is not manifest? Can it fairly be said that this general legislation following the special charters of the defendant and others, neither in terms nor by necessary construction affects the particular grants? Especially when it is remembered that every special charter is granted and accepted subject to such police regulations as to the exercise of granted powers as the legislature may establish.

This general statute forbidding the construction of a grade crossing without application to the railroad commissioners, cannot operate except where a particular statute has given the right to cross at grade; certainly not until a new legislature has enacted new particular laws granting new particular rights to cross at grade; it is aimed at nothing unless it is aimed at the particular rights claimed by the defendant and others under special charters. In this sense the law is not of general application; its first range of operation is wholly confined to the particular cases specified in existing special charters. The rule of construction that a particular grant which may stand, together with the provisions of a statute of general application, is not repealed by the enactment of such statute, unless the intention of the legislature to repeal the particular grant is manifest, cannot apply when the operation of the general statute is confined to such particular grants, and the maintenance of the grants unaffected by the statute must render the statute wholly inoperative. In such case and in this case the two statutes cannot stand together; they are wholly repugnant, unless these special charters are construed as granting the right to cross at grade subject to the police regulations of the State.

The defendant also seems to claim that the circumstances attending the passage of these laws, as shown by the record, and those facts of which the court has judicial knowledge, indicate an actual intent on the part of the legislature to permit the grade crossing in question without any application to the railroad commissioners, and without their approval based upon a searching investigation as to the relation of the

loss of human life to railroad profits and increased facilities for travel involved in the establishment of this crossing. It seems to me that a consideration of these circumstances fairly indicates an opposite actual intention.

When the legislature of 1893 met, it found a large number of applications for special charters for building electric railroads awaiting its action. Thirty-five or more such charters were finally granted, authorizing electric railroads in every portion of the State. Many of these charters contained, in terms more or less particular, the right to cross steam railroad tracks at grade; all of them required special legislation as to the exercise of the franchises asked. The incorporation by the legislature into each one of these charters of the particular regulations demanded by public interest seemed impracticable, and they were provided for by public laws. One relating to the detail of location, and operation, and to special regulations to be complied with before the work of construction should begin, was passed June 1st, and given immediate effect; one amending the Act of 1889, (which as was claimed, forbade all grade crossings,) so that the various particular grants to cross steam railroads at grade could not be exercised without the approval of the railroad commissioners, was passed June 14th, to take effect after the rising of the General Assembly. Until June 14th, none of these thirty-five special charters, applications for which had been pending since January, were passed; between that date and the adjournment on June 30th, they were all passed. It seems very clear that the legislature in fact understood that the passing of these charters with the right to cross steam railroads at grade might repeal the existing law, if that absolutely forbade such crossing; and so did not pass them until it had passed a general Act which, by taking effect after the rising of the General Assembly, would thereby prevent the exercise of the various particular rights that might be granted without the approval of the railroad commissioners; and intended in passing the defendant's charter, to couple the right to cross at grade at a point notoriously dangerous, with the additional burden of being subject at all times

to such regulations as the railroad commissioners, on application, might make, but did not intend that such crossing should be constructed, unless its construction should be approved by the commissioners.

But the actual intent of a legislature, as distinguished from the legal effect of its laws, is a thing impossible to ascertain, and has no existence. for the purpose of judicial construction. During the session of a legislature its actual intent can operate at its will on legislation; but at the moment of adjournment, its actual intent as distinguished from its acts, ceases to exist. It is expressed only by the legal effect of its laws ; and what that legal effect is, becomes a judicial and not a legislative question. When obscure language has been used, when laws apparently conflicting have been passed, it is for the court to say what has legally been done. We speak of being guided by the intent of the legislature in reaching such judicial judgment, but such phrase is really a figure of speech. The court can see and give effect, if possible, to the patent purpose of the law, but it cannot in fact be guided by any supposititious legislative intent, actual or artificial. It can only ascertain, as accurately as possible, the most reasonable effect that can be given to uncertain legislation, in view of all the language used, and in accordance with those general principles of construction which experience has established as safe guides in reaching a just conclusion. Not infrequently the result reached is of necessity, directly contrary to what we have every reason to suspect might prove to be the actual intent of the legislature, if such intent were susceptible of ascertainment. These general principles oftentimes conflict with each other, when applied to a particular case, and the court is then obliged to weigh their relative importance, not always absolutely, but as applied to the case in hand. The question of construction now presented is in some respects a very peculiar one ; and well established rules of construction, if followed without reference to each other, might point to different results. But it seems to me that, giving due weight to all the considerations the court should entertain,

the only reasonable effect that can be given to this conflicting legislation is, that the special charters give particular rights to cross steam railroad tracks at grade, and that the general Act prohibits the exercise of such particular rights without the approval of the railroad commissioners.

But if this result were doubtful; if the true legal effect of this legislation were open to grave doubt—and the able and plausible arguments which have been made on both sides of the question, as well as the fact that the court is divided in opinion, suggest strong reasons for holding that such a doubt really exists—then it seems to me entirely clear that such doubt must be solved by the application of the well established rule, that in case of serious doubt the court ought not to give a construction which will make the law inconsistent, instead of consistent, with the settled policy of the State ; especially when such construction will authorize, without the investigation heretofore required in such cases, the establishment of a public nuisance admittedly dangerous to human life, and apparently uncalled for by any adequate public necessity.

Concurring with the majority of the court in the views expressed on the other questions involved, I think there is no error in the judgment of the Superior Court.

In this opinion ANDREWS, C. J., concurred.