JOHN B. DYSON, ADMINISTRATOR, *vs.* THE NEW YORK AND NEW ENGLAND RAILROAD COMPANY.

Hartford Dist., May T., 1888. PARK, C. J., CARPENTER, PARDEE, LOOMIS and BEARDSLEY, Js.

A railroad passenger train, run at a high rate of speed, though not higher than was usual for fast trains, ran over and killed at a highway crossing the plaintiff's intestate, who was driving an omnibus on the highway. The crossing was in the outskirts of a city, but within the city limits, but the neighborhood was not a thickly settled one. The highway was however a much used thoroughfare. The city had authority by its charter to limit the rate at which trains might be run within its limits, but had made no order on the subject. The railroad track approached the highway by a curve, which, with the height of the intervening ground, and the buildings, fences and trees between, for two hundred feet from the crossing, made it difficult to see from either to the other until the engine was about twenty feet from the crossing. Held that the railroad company could not be held negligent on account of the speed of the train.

As a general rule negligence cannot be inferred from speed alone.

The bell and whistle of the engine were sounded in the usual manner as the train approached the crossing and the bell was kept ringing up to the time of the collision, and there was nothing to materially obstruct

their sound. These danger signals, with warning boards on the highway, were all that were required by the statute, and the railroad commissioners, who were authorized to require other signals and safeguards at crossings if they thought them necessary, had made no order with regard to this crossing. Held that the company was not negligent in not having provided other signals or safeguards.

A statute which requires of railroad companies certain precautionary measures at highway crossings, is exhaustive and defines the whole of the ordinary duty of such companies in the matter.

There may however be special circumstances which impose upon an engineer the duty of slackening the speed of his train at a particular time; as where he sees that a person is crossing the track or there are sounds which might prevent the signals from being noticed. In such a case the company would be liable for his negligence.

A fireman saw the omnibus at some distance from the crossing, but did not call the attention of the engineer to it until it was again seen just before the collision. Held that the company was not made liable by this fact.

No general duty rests upon an engineer in respect to a traveler whom he sees approaching a crossing. He has ordinarily a right to assume that he will regard the signals if they have been given, and will stop when he reaches the railroad, and is called upon to act only when the traveler is so near the crossing as to alarm him.

Photographic views of the scene of an accident are admissible in evidence as a correct representation of the place. Any difference that arises from the views being taken at a different season of the year can be explained.

[Argued May 18th—decided July 20th, 1888.]

ACTION to recover damages for the death of the plaintiff's intestate through the negligence of the defendant, a railroad company, in the running of one of its trains; brought to the Superior Court in Hartford County, and heard in damages after a default by *Sanford, J.* The following facts were found by the court.

The defendant company, on the first day of October, 1885, was engaged in the general railroad passenger and freight business between Waterbury in this state and Boston in the state of Massachusetts. Its line of railroad runs through the city of New Britain. On that day and previous thereto John B. Dyson was the owner of a line of omnibuses and carried passengers for hire from a point about a mile from the center of the city into the city and from the city back. On the morning of that day a passenger train running over

the defendant's road from Waterbury easterly, to and through New Britain, came into collision with one of Dyson's omnibuses drawn by two horses at what is known as Black Rock Crossing, which is a grade crossing on West Main street in the city, and over which the omnibus and horses were going on one of their regular trips to the center of the city. The horses were being driven at the time of the collision with the knowledge and authority of Dyson by the intestate, his son, seventeen years of age, who was, and for a considerable period had been, the regular driver of the team; and inside the omnibus, the entrance to which was by a door at the rear end, were his two sisters, aged fifteen and thirteen years respectively, who were on their way to school. By the collision all three children were killed, one of the horses was killed, the omnibus destroyed, and some damage done to the harnesses. This suit is brought by the administrator of Charles Dyson, to recover damages for the injuries resulting in his death, and two other suits were brought against the defendant by the administrator of the other two children for injuries resulting in their deaths, and a suit was also brought by John B. Dyson individually to recover damages for the injuries to his horse, omnibus and harnesses. All the cases having been previously defaulted, were by agreement heard and considered together upon the question of damages.

Black Rock Crossing is just within the limits of the city on West Main street. This street is a main thoroughfare leading westerly from the city and is much frequented, not only by the residents of the town and city of New Britain, but by travelers between the towns of New Britain, Plainville, Forestville, Farmington, Bristol and Southington. The railroad approaching the crossing from the west runs upon quite a curve and passes through a series of three cuts ranging in height from four feet to seven and one half feet. A traveler approaching the crossing on the highway from the west could not, at the time of the collision, for a distance of two hundred feet from the crossing, see a train approaching from the west until he reached the company's right of

way, the view being obstructed by intervening buildings, fences, banks, foliage and herbage. An engineer approaching the crossing from the west, could not from his post on the engine, at the time spoken of, see a traveler approaching the crossing from the north until his engine was within about twenty feet of the crossing, and until too late to do anything to avert a collision between his engine and the traveler. The highway met the tracks at an angle of about forty-five degrees. The crossing was not protected by a flagman, gate, or electric bell, nor by any means whatever save the ordinary warning boards by the side of the road. On the morning in question the train from Waterbury to Hartford left Plainville, the next station west of New Britain, at 8:27 o'clock. The time for leaving Plainville according to the schedule was 8:15 o'clock, but owing to making connections at Plainville with the Canal road, the morning train to Hartford frequently did not leave Plainville till some minutes after the schedule time. The schedule time for the train to leave New Britain was 8:30 o'clock, but if it could reach New Britain as soon as 8:39 o'clock it had the right of way. From a point about one half mile west of Black Rock Crossing the grade begins to descend, and descends at the rate of forty feet in a mile to the New Britain station. The crossing is about a mile from the New Britain station. At the time of the collision the train was running from thirty-five to forty miles an hour and the engineer did not see the omnibus and horses until he was within about twenty feet of the crossing. He then applied his air-brakes and as soon as possible reversed his engine and sanded the track, but nothing that he did or could do at the time he first saw the omnibus was effectual to avert the collision or perceptibly to diminish the speed of the train until after the collision had occurred. The train did not come to a stop until it had gone 2175 feet beyond the crossing. The engineer had frequently been over this crossing, and he knew there were no danger signals there except as above stated and that he could not from his post upon the engine see a traveler approaching the crossing from the north until the engine was

about twenty feet from the crossing. The fireman upon the engine saw some portions of the approaching omnibus when he was about six hundred feet from the crossing, but he did not call the attention, of the engineer to it until just before the collision and until too late to avert it. The bell and whistle of the engine were sounded in the usual and regular manner upon approaching the crossing, and the bell was ringing up to the time of the collision.

John B. Dyson's house was on the road leading to the crossing and about three hundred feet north of it. The leaving time for the omnibus to make one of its regular trips that morning was 8:30 o'clock. At the leaving time the intestate was upon the omnibus in the highway, the girls were inside and the horses were at a standstill. Then he started along at a slow trot. The team was seen only immediately after starting and just before reaching the crossing. The proper place after starting for the driver to have stopped was in the interval when he was unseen and just before he was next seen, which was when he was descending the grade towards the track, the horses going a little faster than a man would walk, he holding a line in each hand, his whip in his right hand and his right foot on the brake of the omnibus. For the first one hundred feet north of the track the highway rises at a grade of five and twelve hundredths feet. The collision occurred at 8:34 o'clock.

John B. Dyson, the father, having testified that Charles had been accustomed to drive and care for horses from an early age, that he had driven this omnibus for several weeks, making fourteen trips daily over the route, that he was a strong young man, and that he, the father, had often ridden with him and observed his management of horses and of the team that he was driving at the time of the collision, was then asked what sort of a driver Charles was, and replied that he was a careful driver. To this question and answer severally the defendant objected as irrelevant and calling for a matter of opinion, but the court admitted them, the defendant excepting. Similar testimony was received against like objection and exception from John A. Andrews, Charles

E. Hart, and David Doolittle. As above stated, all four cases were heard together, and in interposing the objections the defendant made no distinction between the cases.

The plaintiff offered various photographs taken a year or more after the accident as representations of the *locus in quo*. The introduction of these photographs was accompanied by the evidence of the photographer who took them as to their accuracy, and of a surveyor who identified the points of view. The *locus in quo* remained unchanged (with the exception of an addition to a building, which was fully explained to the court), during the time intervening between the accident and the taking of the photographs, but the latter were taken in the winter season. To their introduction in evidence the defendant objected on the ground that they were not primary evidence or from their nature competent evidence, and that such evidence was misleading, immaterial and irrelevant; but the court admitted them, the defendant excepting.

It was found that the collision was caused by the negligence of the defendant company, and that there was negligence on its part in running its train on the morning in question at such a high rate of speed over a crossing which was specially dangerous, and that there was also negligence on the part of the fireman in not sooner calling the attention of the engineer to the presence of the approaching omnibus, and that there was no contributory negligence on the part of the plaintiff's intestate, the driver of the vehicle.

It was also found that there was negligence on the part of the defendant in not protecting the crossing by a flagman, gates, or some danger signals other than those that were employed, in view of the high rate of speed at which it customarily ran its trains over the crossing.

Upon these facts the court assessed the damages at seven hundred and fifty dollars. The defendant appealed.

*S. E. Baldwin* and *E. D. Robbins* for the appellant.

*First.* The grouping together of a number of grounds of negligence, each insufficient if taken alone, will not make

the whole stronger than the parts. *Nolan* v. *N. York, N. Haven & Hartford R. R. Co.*, 53 Conn., 461, 474. In the case at bar the court rests its finding as to the defendant's negligence on several grounds indistinguishably, and if any one of these is inadequate, we submit that the resulting negligence cannot be found, since it may have rested, in the mind of the judge, on that particular cause thus found inadequate.

1. One of the causes relied on was the failure to provide a flagman or electric signal. The statutes confide the power to order such safeguards to the railroad commissioners, and give the Superior Court only power on appeal from their decision, with a provision for apportioning the expenses between the railroad and the city. Gen. Statutes, §§ 3423, 3425. It would be contrary to the policy of these statutes to let the court, in the first instance, and retrospectively, try the question whether a certain crossing should have been guarded in a certain way. *Salem & Hamburgh Turnpike Co.* v. *Lyme*, 18 Conn., 451. And in the present case the judge who tried the case, in determining the question of negligence, had no broader functions than a jury. To leave it to a jury to determine whether stationing a flagman would have been a necessary and proper precaution, in a case of this sort, whatever might be the character of the highway, would be tantamount to directing a verdict for the plaintiff. Pierce on Railroads, 353. In *Haas* v. *Grand Rapids & Ind. R. R. Co.*, 47 Mich., 401, the court, by COOLEY, J., say:— "It is said this crossing was so peculiarly dangerous, because of the excavations through which are run both the highway and the railroad, that the railroad did not discharge its full duty to the public unless it stationed a flagman there to give warning of approaching trains, and that the failure to have such a flagman was negligence directly contributing to the casualty. It would no doubt have tended to the security of travelers had a flagman been kept at this point as suggested, but there is no statute requiring it, and the judiciary cannot establish police regulations on their own judgment where the legislature has apparently considered none essential."

See also *Cliff* v. *Midland Railway Co.*, L. R., 5 Q. B., 264; *Beisiegel* v. *N. York Central R. R. Co.*, 40 N. York, 9; *Weber* v. *Same*, 58 id., 451; *Pakalinsky* v. *Same*, 82 id., 424; *State* v. *Phila. Wilm. & Balt. R. R. Co.*, 47 Md., 76.

2. Another ground of negligence was running at too high a rate of speed. But this also is a matter to be regulated by a different tribunal. The city of New Britain has charter power to make and enforce orders as to "the speed of railroad trains." 6 Special Laws, 926. This train "customarily" ran over this crossing at a high rate of speed. Presumably the city of New Britain was willing that it should do so, in order the better to serve the traveling public. In *Telfer* v. *Northern R. R. Co.*, 30 N. Jer. Law, 192, the court says by the Chief Justice:—"Until the legislature or some lawful municipal authority prescribes a contrary rule, locomotive engineers may run upon the track at such rate of speed as the exigencies of railroad companies require, and may preserve this speed at the usual crossings notwithstanding the approach of other vehicles to the crossing upon the common highway; and under ordinary circumstances it will not be considered either gross or ordinary negligence or what is called want of ordinary care."

3. The fireman's duty is to ring the bell on approaching a crossing. This he did, in this case, up to the very moment of the collision. He saw the omnibus when his engine was about six hundred feet from the crossing, and the omnibus was invisible from the track after it passed a point on the highway two hundred feet from the crossing, since it is found that the view between the railroad track and the highway back to this distance from the crossing was completely obstructed "by intervening buildings, fences, banks, foliage and herbage." The train was going at thirty-five or forty miles an hour, or at least more than fifty feet a second. The team approached the railroad crossing at a gait a little faster than a man could walk. Under these circumstances we submit that, as matter of law, there could be no negligence on the fireman's part in not sooner communicating with the engineer. He had a right to suppose

the boy would stop his team before coming on the crossing. *Warner* v. *N. Y. Cent. R. R. Co.*, 44 N. York, 469. It follows that no fact is found from which negligence can legitimately be inferred. "A mere finding of negligence by the court is of no avail unless the facts appear on which such finding is based." *Schoonmaker* v. *Albertson & Douglass Machine Co.*, 51 Conn., 387, 393.

*Second.* The photographs, taken in winter, when the leaves were off, and necessarily conveying false impressions of curves and lines, were calculated to mislead the court. They represented some of the most important lines as curves when they were straight and straight when they were curved.

*Third.* Contributory negligence is imputable to Charles Dyson, as matter of law, from the facts found. He was familiar with the dangers of the crossing, and the greater the danger the greater must be the precautions to avoid it. *Cincinnati, etc., R. R. Co.* v. *Butler*, 103 Ind., 34; *Knowles* v. *Crampton*, 55 Conn., 344. The omnibus started at the regular hour, 8:30, on a trot, for a regular trip, when this train, also a regular one, had not gone by. He knew that it "customarily" went by at a great speed, and that for the last two thirds of the three hundred feet between his house and the crossing he could not see the train as it approached. He was therefore bound to wait and listen for it. His eyes being useless, he must use his ears. The bell was ringing to warn him of his danger, yet he drove straight forward upon the track. It is not claimed that he was deaf and could not hear. The only conclusion is that either he did hear and thought he could get across before the train reached the spot, or that he was so careless as not to listen, at this dangerous place, for the signals prescribed by the law to warn all travelers of the danger they might encounter there. *Peck* v. *N. York, N. Haven & Hartford R. R. Co.*, 50 Conn., 379, 392; *Railroad Co.* v. *Houston*, 95 U. S. R., 697; *Schofield* v. *Chicago, Milw. & St. Paul R. R. Co.*, 8 Fed. Rep., 488; *Tully* v. *Fitchburg R. R. Co.*, 134 Mass., 499. The finding of the court that there was no "contributory negligence" is contradicted by

the facts on which it is predicated. "Negligence is a failure
to perform some duty or the performance of a duty in an
improper manner. In any given state of facts the law de-
termines the duty." *Schoonmaker* v. *Albertson & Douglass
Machine Co.*, 51 Conn., 387, 392.

*C. E. Mitchell* and *F. L. Hungerford*, for the appellee.

1. The defendant appears to claim that, in the absence
of orders by the state and municipal authorities as to danger
signals at crossings and the speed of trains in cities, it may
safely rely upon the ordinary warning boards at crossings
and drive its trains at any rate of speed over any public
thoroughfare, however dangerous it may be. Thus it at-
tempts to shift the responsibility of collisions from itself to
the public authorities. This position ignores the elementary
rule of law that railroads and the traveling public have
mutual and reciprocal duties and obligations at grade cross-
ings, and that each must have a proper regard for the rights
of the other. In case of a collision the question is, as to the
railroad company, whether, under all the circumstances, it
used reasonable and proper care. Reasonable and proper
care may or may not demand a slow rate of speed; it may
or may not demand other than the ordinary warning boards
at crossings. If the case called for a slackened rate of speed
it is no excuse to say that the municipal authorities had not
required it. If the case called for danger signals it is no
excuse to say that the railroad commissioners had not order-
ed them. Only a few of the many authorities on this part
of the case will be cited. "Indeed we think that loco-
motives with trains of cars attached should not be allowed
to pass through the inhabited parts of our cities with such
force or speed as to be incapable of immediate and absolute
control, and even then not without special care to see that
the track is all clear in its curved and more difficult places."
*Daley* v. *Norwich & Worcester R. R. Co.*, 26 Conn., 595.
"If an unslackened speed is desirable, watchman should be
stationed at the crossing." *Continental Improvement Co.* v.
*Stead*, 95 U. S. R., 161, 164. A train should approach a

crossing at a moderate rate of speed. *Reeves* v. *Del., Lack. &
Western R. R. Co.*, 30 Penn. St., 454; *Phil. & Trenton R. R.
Co.* v. *Hagan*, 47 id., 244; *South & North Ala. R. R. Co.* v.
*Thompson*, 62 Ala., 494. " Compliance with statutory require-
ments as to blowing of whistle and ringing bell is no defense
if other precautions are reasonably necessary." *Linfield* v.
*Old Colony R. R. Co.*, 10 Cush., 562; *Eaton* v. *Fitchburg R.
R. Co.*, 129 Mass., 364; *Tyler* v. *N. York & N. England R.
R. Co.*, 137 id., 241; *Eaton* v. *Erie R. R. Co.*, 51 N. York,
544; *Weber* v. *N. York Central R. R. Co.*, 58 id., 451; *Dyer*
v. *Erie R. R. Co.*, 71 id., 228. " It is to be observed that
the duty of a railroad company as to the degree of prudence
to be exercised and the precautions to be taken to operate
its railroad with safety to the public is not limited to those
things specially required by statute. Whatever precautions
a prudent management of the road with respect to the pub-
lic safety would require, it is the duty of the company to
take, though they may be in addition to those required by
statute, or though there be no statutory requirement on the
subject. The specification by statute of certain precautions
to be taken is not to be construed as a license to the com-
pany to omit other precautions that may be necessary, nor
does the silence of the statute as to any particular precau-
tion exempt the company from the duty of taking it if it be
one which proper prudence requires. So, if the city coun-
cil be authorized to limit the rate of speed at which engines
and trains shall run, and there be an ordinance on the sub-
ject, still if ordinary care and prudence and due regard for
the safety of other persons require them to be run at a less
rate of speed, the company must observe such care and pru-
dence." *Shaber* v. *St. Paul, Milw. & Chicago R. R. Co.*, 28
Minn., 107. " It [a railroad company] is not necessarily
absolved from blame by showing that it complied with all
statutory regulations, since, while doing so, it may have
neglected its common law duties." Shearman on Negli-
gence, § 484. While upon this question of the negligence of
the company we would call the attention of the court to the
fact that the defendant does not claim, in its assignments

of error, that the court below erred in finding negligence on the part of the fireman in not sooner calling the attention of the engineer to the presence of the approaching omnibus.

2. The question whether or not Charles Dyson was guilty of contributory negligence was a question of fact, which has been disposed of finally by the court below. *Nolan* v. *N. York, N. Haven & Hartford R. R. Co.*, 53 Conn., 475.

3. There was no error in the admission of the photographs described in the finding. They were representations of the *locus in quo*, and were accompanied by the evidence of the photographer as to their accuracy, and of a surveyor who identified the points of view. They were clearly admissible. Abbott's Trial Evidence, 102, and cases cited; *Marcy* v. *Barnes*, 16 Gray, 161; *Blair* v. *Inhab: of Pelham*, 118 Mass., 420; *Randal* v. *Chase*, 133 id., 210, 213.

BEARDSLEY, J. The Superior Court finds that the collision which caused the death of the intestate was produced by the negligence of the defendant company, and has detailed the facts, and presumably all the material facts, upon which it formed that conclusion.

The question presented by the second assignment of errors is, whether these facts are legally sufficient to justify the finding of negligence. Such negligence is found to consist of a violation of duty by the defendant in three particulars.—First, in running its train at so high a rate of speed over the crossing in question;—second, in not protecting the crossing by a flagman, gates or some danger signal other than those which were employed; and, third, that the fireman on the train was negligent in not calling the attention of the engineer to the approaching omnibus.

Was the defendant company negligent by reason of the rate of speed which was maintained at the crossing? The crossing is just within the limits of the city of New Britain, and the highway which forms it is much traveled, but we infer from the finding, and especially from the photographic sketches of the locality, that it was not surrounded by a thickly settled neighborhood. The train in question was

running at a rate of speed which, though high, cannot at the present day be regarded as excessive for a fast passenger train, and we infer, from the finding that trains " customarily run over the crossing at a high rate of speed," that it was not unusual.

The city of New Britain had made no order limiting the speed of trains at the crossing, though authorized by its charter to do so.

We think that the court below erred in its conclusion that it was the legal duty of the defendant company to slacken the speed of its train. As a general rule negligence cannot be inferred from speed alone. In the case of *Warner* v. *N. York Central R. R. Co.*, 44 N. York, 465, the law is thus stated :—" The law places no restrictions upon the rate of speed at which trains may be run across the country, at the crossings of highways or elsewhere ; nor is the train required to stop or reduce its speed at such places, * * * nor does the law subject the company to liability to damages occasioned by the rate of speed if the signals required by law are observed." To the same effect are *Telfer* v. *Northern R. R. Co.*, 30 N. Jer. Law, 188, 192; *Chicago, Burl. & Quincy R. R. Co.* v. *Lee*, 68 Ill., 576; *Same* v. *Harwood*, 80 Ill., 88; *Grows* v. *Maine Central R. R. Co.*, 67 Maine, 100.

It is found that the crossing was especially dangerous. It was undoubtedly so as compared with those where the traveler upon the highway has a continuous view of the approaching train for a considerable distance. The fact that the view was intercepted for the distance of two hundred feet on the highway until the approaching train was within twenty feet of the crossing, and that the railroad curved as it approached the crossing, were elements of danger to the traveler upon the highway.

The habits of men are such that all crossings of highways by railroads at grade are practically dangerous, and it is the policy of the state to abolish them as fast as is practicable. The danger arises mainly from the forgetfulness of the railroad employees or the inattention or temerity of the traveler upon the highway.

This danger is obviously diminished where the conditions are such that the traveler is not required to rely upon the danger signals, but can see the approaching train in time to avoid it, and the engineer can see an object at the crossing in time to effectually reduce the speed of his train before reaching it. But such conditions are hardly the more common ones at railroad crossings in this state.

In many, if not in most cases, the traveler must rely for his safety upon the danger signals. In the present case they were given as required by the statute, and so far as appears there was nothing to materially obstruct their sound. The cuts from four to seven and a half feet high, through which the train ran as it approached the crossing, could hardly have this effect, as in ordinary locomotives the whistle and bell are higher than that from the track. The highway was much traveled by inhabitants of New Britain and adjoining towns. It seems highly probable that if a diminished speed at this crossing was essential to the safety of travelers in the exercise of due caution, the city of New Britain would have demanded it.

A rule requiring trains to so reduce their speed before coming in view of all crossings where the conditions are similar to those of this one, as to avoid collision with an object at or near the crossing, would seriously incommode the public and be unnecessary for travelers exercising proper care.

Doubtless in some cases the company might be liable for the neglect of the engineer to slacken the speed of his train if by doing so he might have avoided a collision ; as if he was informed that a person was approaching a crossing in such a condition or under such circumstances as to indicate that he was heedless of the danger signals, as if other sounds were prevailing, as of a thunder storm, which might render the sound of the signals indistinguishable. In such cases the company might properly be charged with the consequences of the personal negligence of the engineer.

Nor do we think that the defendant was guilty of negligence in not providing at the crossing additional signals to

those required by statute. In this state the legislature has assumed the regulation of this matter by providing specifically what signals shall be given of the approach of trains to crossings, and by instructing the railroad commissioners to require other signals at crossings when they shall deem them necessary for the protection of the public. This legislation is exhaustive and defines the whole duty of railroad companies in the matter to which it relates. *Weber* v. *N. York Central R. R. Co.*, 58 N. York, 451; *Pakalinsky* v. *Same*, 82 id., 424; *State ex rel. Foy* v. *Phila., Wilm. & Baltimore R. R. Co.*, 47 Maryl., 76; *Haas* v. *Grand Rapids & Indiana R. R. Co.*, 47 Mich., 401; *Cliff* v. *Midland Railway Co.*, L. R., 5 Queen's Bench, 264.

Nor do we think that upon the facts found the company should be held liable because the fireman did not sooner tell the engineer of the approach of the omnibus. No general duty rests upon the engineer in respect to a traveler whom he sees approaching the crossing, and of course none upon the fireman. Ordinarily he has a right to assume that he will regard the signals if they have been given, and is only called upon to act when the traveler is so near the crossing as naturally to startle him by a sense of danger. The distance of the omnibus from the crossing when seen by the fireman is not found distinctly, but the inference from the finding is that it was at least two hundred feet, as it is found that for that distance the intestate could not see the train until he came to the company's right of way and the engineer from his post on the locomotive could not see the omnibus. If this inference is the correct one the lad must have driven rapidly from that point to the crossing, to have met the train, which was about six hundred feet from the crossing when the fireman saw the omnibus—much more rapidly than he was driving when he started or when he was last seen. But if the horses were driven for the two hundred feet at the same rate as when seen by the witnesses, the probable distance of the omnibus from the crossing when the fireman saw it was about eighty feet. If this was so, we cannot say that he was in fault in not instantly calling the attention of the engineer to it. It

is not unusual for prudent persons driving horses accustomed to trains, to approach as near as or nearer than this to crossings when a train is about to pass.

This view of the case renders it unnecessary to consider the other questions presented by the assignment of errors.

We refer however to the objection made by the defendant to the photographic sketches offered in evidence by the plaintiff, as it presents a question of evidence which has not hitherto been passed upon by this court. The court properly overruled the objection. The pictures represented the crossing in question and its surroundings, and presumably the court below found that it was a correct representation of them; the change in the appearance of the locality made by the falling of the leaves from the trees was of course open to explanation. *Marcy* v. *Barnes*, 16 Gray, 161; *Randall* v. *Chase*, 133 Mass., 210; *Ruloff* v. *The People*, 45 N. York, 213; *Church* v. *City of Milwaukee*, 31 Wis., 512; Abbott's Trial Evidence, 102.

There was error in the judgment appealed from and it is reversed.

In this opinion the other judges concurred.