## AGNES LICHA v. NORTHERN PACIFIC RAILWAY COMPANY AND OTHERS.[1]

December 24, 1937.

No. 31,170.

[1]Reported in 276 N. W. 813.

*Newman & Bowman,* for appellant.

*D. F. Lyons* and *Frederic D. McCarthy,* for respondents.

PETERSON, JUSTICE.

Action for personal injuries in which the court granted defendants' motion for judgment on the pleadings and plaintiff's opening statement. Plaintiff moved for a new trial, which was denied, and appeals.

It appears that plaintiff was a passenger in an automobile driven by another, which was traveling in an easterly direction on Maryland street in the city of St. Paul at about 3 :15 o'clock a. m. on the morning of December 15, 1935. There were six people in the car. The defendant's tracks lie in a rather deep valley, into which Maryland street descends from an elevation on the west, first crossing the tracks of the Soo Line railroad and proceeding thence downhill. Just before the street crosses defendant's tracks there is a slight rise so that defendant's tracks are situated in such a position that the lights of an automobile do not shine on a train if there be one

on the crossing. The night in question was dark and exceptionally foggy. The city of St. Paul maintains an electric light at the intersection, which was extinguished at about 2:30 o'clock a. m. On the driver's right-hand side of the road at a point about 30 feet west from the nearest rail and about 19 feet to the right from the center of the road was located a post on which were placed two cross boards to indicate a railroad crossing and a reflector type signal which read "Stop." The post and sign complied with the requirements of the railroad and warehouse commission. The driver could not see the post by reason of its location and the darkness and fog with which it was surrounded, nor the train and tracks by reason of the grade of Maryland street descending to within a short distance of the tracks, the rise just before reaching the tracks, and the intense darkness and fog. The fog was of such density that the light from the lamps on the automobile was unable to pierce the same. The automobile was proceeding at between 15 and 25 miles per hour. Maryland street is one of the principal thoroughfares of the city of St. Paul, rather heavily traveled. Other than the post and train on the tracks, there was no warning to approaching travelers. By reason of the conditions there prevailing, plaintiff claims that the crossing was extra-hazardous and that it was the duty of the defendant to exercise care commensurate with the conditions there then existing, and to give some additional warning to those approaching the crossing. Defendant's contention is that (1) by the installation of the post and sign in compliance with the regulations of the railroad and warehouse commission it was relieved of the duty to give any other warning at the crossing, and (2) that the proximate cause of the accident was not any act or omission of the defendant.

■ The question in this case is whether or not a railroad may be required to take precautions in the management and operation of the road with respect to the public safety in addition to those required by statute or order of the railroad and warehouse commission. Defendant contends that this case is ruled by Olson v. C. G. W. R. Co. 193 Minn. 533, 259 N. W. 70, 72, which was decided by a divided court, Mr. Justice Loring writing a dissenting opinion in

430

which Mr. Chief Justice Devaney and Mr. Justice Hilton concurred. If that decision stands, defendant's contention must be sustained. Before examining that decision, it is well to know what the rule in cases of this kind is, without regard to it. The dissenting opinion in the Olson case adequately deals with the question. This question has been discussed in so many cases that it is impossible to review all of them without unduly extending this opinion. The rule was well settled in Minnesota prior to Olson v. C. G. W. R. Co. *supra*, that a railroad is bound to take such precautions in the management and operation of the railroad as the public safety requires, though they may be. in addition to those required by statute or order of the railroad and warehouse commission or though there be no statute or order upon the subject. 5 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934, 1937) § 8174, cases cited in note 56. This is the universal rule. Note, 71 A. L. R. 369, *et seq.*, where it is said:

"It is generally held that the statutory requirements for safety devices at crossings merely prescribe the minimum of care, and, when the crossing is dangerous and prudence demands it, additional safety devices must be provided to the extent necessary to meet the situation."

The United States Supreme Court firmly established the rule by taking the lead in Grand Trunk Ry. Co. v. Ives, 144 U. S. 408, 12 S. Ct. 679, 684, 36 L. ed. 485, and the courts of Alabama, District of Columbia, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Michigan, Missouri, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, and Connecticut have followed the rule. Connecticut was out of line in Dyson v. New York & N. E. R. Co. 57 Conn. 9, 17 A. 137, 14 A. S. R. 82, but because its rule was erroneous it was abandoned, and that state adopted the majority rule in Pratt, Read & Co. v. New York, N. H. & H. R. Co. 102 Conn. 735, 130 A. 102; see Elukowich v. New York, N. H. & H. R. Co. (D. C.) 291 F. 574. Minnesota, since the decision in the Olson case, is now out of line with the current of authority. In Grand Trunk Ry. Co. v. Ives, *supra*, the court said [144 U. S. 420]:

"It is also held, in many of the States (in fact, the rule is well nigh, if not quite, universal), that a railroad company, under certain circumstances, will not be held free from negligence, even though it may have complied literally with the terms of a statute prescribing certain signals to be given, and other precautions to be taken by it, for the safety of the traveling public at crossings."

The authorities are uniform in support of the rule: 22 R. C. L. p. 998, § 226; 52 C. J. p. 178, § 1773; note, 60 A. L. R. 1110; 2 Thompson, Negligence, § 1555; 2 Shearman & Redfield, Negligence (6 ed.) § 463a; Wharton, Law of Negligence (2 ed.) § 799. The reason for the rule is plain. In the absence of statute, a railroad is bound to exercise due care in the management and operation of the road. Shaber v. St. P. M. & M. Ry. Co. 28 Minn. 103, 9 N. W. 575; Zenner v. G. N. Ry. Co. 135 Minn. 37, 159 N. W. 1087; Gowan v. McAdoo, 143 Minn. 227, 173 N. W. 440, 442; Crosby v. G. N. Ry. Co. 187 Minn. 263, 245 N. W. 31. Statutes have been enacted requiring railroads to perform specific acts or take specific precautions for the public safety. One statute after another has been enacted, adding to the number of specific requirements. The purpose of these statutes is to increase, not decrease, public safety, by additional requirements imposed upon railroads. They supplement and do not repeal existing law. They amend existing law only by the addition of specific and minimum requirements. By specific requirements for safety at crossings, which deal with the matter of safety only in particular respects, it is not the intention to do away with the exercise of due care in all other respects. In the Shaber case, 28 Minn. 103, 9 N. W. 575, 577, Mr. Chief Justice Gilfillan well said, 28 Minn. 107:

"Whatever precautions a prudent management of the road, with respect to the public safety, would require, it is the duty of the company to take, though they may be in addition to those required by statute, or though there be no statutory requirement on the subject. The specification by statute of certain precautions to be taken is not to be construed as a license to the company to omit other precautions that may be necessary;    *    *    *"

In C. B. & Q. R. Co. v. Perkins, 125 Ill. 127, 17 N. E. 1, the Shaber case was cited, approved, and followed. In Grippen v. New York Cent. R. Co. 40 N. Y. 34, 42, the court said:

"But the rule [the duty to exercise due care at common law independent of statute] stands, and the statute stands with it; both must be satisfied. And hence, it is properly said, the statute does not constitute the sole rule of duty."

In speaking of the effect of such statutes in Gowan v. McAdoo, 143 Minn. 227, 232, 173 N. W. 440, we said: "* * * it must be remembered that the statutes only prescribe the minimum of care required."

If anything more were to be said upon this phase of the subject, it would be to remember that our primary concern is to do justice. In 2 Thompson, Negligence, § 1555, the footnote criticizes the few authorities to the contrary, which happily at that time did not include Minnesota, and expresses the thought exactly:

"If these decisions, taken in the aggregate, mean that a compliance with the requirement of the statute is sufficient for ordinary purposes, they are well enough; but if they mean that, under all circumstances, no matter what the nature of the public peril at the crossing, the railway company is to be released from taking other precautions which ordinary social duty and common prudence may suggest, then they are to be condemned as careless of justice, opposed to the dictates of humanity, and inconsistent with the great weight of judicial authority."

■ The rule as stated still applies unless it has been changed by L. 1925, c. 336. The question is whether that statute was intended to make a complete code regulating the conduct of railroads and exonerating them from taking precautions other than those provided in the statute. Our problem and the answer are well stated by the author of 2 Thompson, Negligence, § 1555, p. 234:

"If the legislature has enacted a code of regulations for the running of railway trains, or if it has empowered the railway commissioners to make such a code, and if it has done this in language

which plainly indicates its intent that this code shall be exclusive and shall exonerate the railway company from the duty of acting outside of it, no matter what the situation may be,—then these decisions [those holding *contra* to the rule stated *supra*] are justified; otherwise not."

In Olson v. C. G. W. R. Co. 193 Minn. 533, 537, 259 N. W. 70, we announced a contrary rule upon the theory that L. 1925, c. 336 (1 Mason Minn. St. 1927, §§ 4743-1 to 4743-17) was a comprehensive statute, dealing with the entire matter of crossing signs, their manner of placement, and the duties of railroad companies in connection therewith, clearly indicating an intention on the part of the legislature "to occupy the entire field." The basis of that decision is that the law is a uniform act dealing with the entire matter of safety, superseding and excluding all other regulations.

What is meant by the expression in the Olson case that c. 336 occupies "the entire field"? If it is meant that the legislature has conferred on the railroad and warehouse commission the power to provide for the installation of signs, safety devices, stationing of flagmen, and similar measures, the statement concededly is correct. But the question still remains, what is the scope and effect of such orders and measures taken pursuant thereto? If it is meant that the making of such orders and compliance therewith dispenses with all other duty to exercise due care for the public safety in the management and operation of railroads, it is manifestly inaccurate and erroneous, because the orders and compliance therewith fall far short of occupying the entire field and because they do not have the legal effect claimed for them, as has already been pointed out. Admittedly, our statutes did not constitute such a code prior to the enactment of c. 336. We had a number of statutes, each one providing for a specific requirement, part of the general law for safety of crossings. An examination of c. 336 discloses that it did not establish a code of regulations for the running of railway trains, nor does it authorize the railroad and warehouse commission to adopt such a code. The legislature has not indicated any intention to exonerate railroads from the duty of exercising due care

by acts in addition to the statute and orders of the commission if necessary for public safety. The statute does not purport to and it does not in fact occupy the entire field. L. 1925, c. 336, contains some new provisions, but most of it is not new. The matters that have been added are substantially amplification of power previously possessed by the commission, with added provisions to make their exercise more efficient. New provisions for uniformity of regulation and granting power to apportion the cost of grade separations can hardly be claimed to extend the statute so as to occupy the entire field. The granting of exclusive authority to the railroad and warehouse commission relates not so much to the occupation of the entire field of regulation of the operation of railroads as it does to the governmental authority by which such regulations shall be made. The statute simply revokes previous delegations of regulative authority and redelegates such authority to the commission. In State ex rel. City of St. Paul v. M. St. P. & S. S. M. Ry. Co. 190 Minn. 162, 164, 251 N. W. 275, 276, we indicated the scope of the statute by saying: "It (L. 1925, c. 336) much amplified existing statutes but did not explicitly amend any."

A brief résumé of the statute will demonstrate what is meant. The provisions of the law which it is claimed result in enlargement of regulation so as to occupy the field are really old statutes amplified. First, there is the provision for uniform warning signs. The statute provides for uniform warning signs of three different types, which it makes it the duty of the railroad company to erect when ordered by the commission, confers power on the railroad and warehouse commission to order additional signs at crossings, where they are needed, and to order "stop" signs installed in certain cases. Substantially the same powers were possessed by the railroad and warehouse commission under G. S. 1923, §§ 4733 to 4743, inclusive. The only new matter with respect to such signs is that of uniformity. It is claimed also that provisions of the statute authorizing the commission to require watchmen at certain crossings and to order the installation of additional safeguards at crossings are evidence of such enlargement of regulation. That the possession of such powers is not susceptible of such a construction is made mani-

fest by the fact that the commission possessed the same powers under L. 1905, c. 280; L. 1919, c. 434, as amended by L. 1921, c. 500.

Finally, it is claimed that, if evidence were wanting to show such a legislative intent, it is to be found in the provisions of the act (§ 13 and similar sections) authorizing the commission to hold public hearings to pass upon and determine what safety devices shall be installed and precautions taken. But this provision is not new. It was possessed by the commission under L. 1905, c. 280, and L. 1919, c. 434, as amended by L. 1921, c. 500, which provided:

"The Railroad and Warehouse Commission of its own motion, may investigate and determine whether any railroad crossing over any street or public highway, now or hereafter established and traveled, or to be traveled, in this state, is, or will be when opened to public travel, dangerous to life and property, or either, and may order the same protected in any manner it may find reasonable and proper, including requiring the company to separate the grades." G. S. 1923, § 4741.

The new matters are those relating to uniformity, the power of the commission to apportion the cost of grade separations between railroads and the public, prohibition against the obstruction of signs at crossings by other signs, and a provision relative to the duties of drivers, requiring certain vehicles such as school buses, oil trucks, and trucks with tows to stop at railroad crossings, and other drivers to reduce their speed. The provision with respect to uniformity and apportionment of the cost of grade separations has been construed to vest entire authority with respect to those matters in the railroad and warehouse commission. State v. N. P. Ry. Co. 176 Minn. 501, 223 N. W. 915; City of St. Paul v. G. N. Ry. Co. 178 Minn. 193, 226 N. W. 470; State ex rel. City of St. Paul v. M. St. P. & S. S. M. Ry. Co. 190 Minn. 162, 251 N. W. 275. The effect is simply to revoke delegation of power previously made to municipal corporations and unify some separate statutes with respect to the matters included in L. 1925, c. 336. The authority recalled is again delegated, not to local subdivisions of government, but to the railroad and warehouse commission.

Other law, statutory and common, imposed on railroads duties to warn at crossings. Duties as to headlights on locomotives, the giving of signals by ringing bells and blowing whistles, excessive speed of trains, backing and pushing of trains and "kicking" cars across streets, are only a few that might be mentioned. It has never been thought that c. 336 occupied the field so far as relates to these matters. These and the subject of due care in the operation of trains in respects other than have been mentioned are omitted from c. 336. It is quite obvious that the statute does not occupy the entire field.

No inference may be made from either the provisions or scope of the statute that it was the intention to establish a new rule as to the effect of the requirements of the statute or the orders of the commission. The statute does not declare the consequences on civil liability of compliance or noncompliance by the railroad with the act or the orders of the commission. It is apparent from § 17 of c. 336 that the legislature had in mind the effect upon the question of liability of compliance or noncompliance with the act, because it expressly provides that violation of §§ 7 and 8 "shall not of itself constitute contributory negligence as a matter of law." By declaring the effect of violations of §§ 7 and 8, the legislature has by implication failed to declare what is the effect of compliance or noncompliance with the rest of the act. In some statutes it is customary to do so. For example, in the motor vehicle law, noncompliance is declared in some cases to be *prima facie* negligence. Other statutes declare the effect of compliance or noncompliance. It necessarily follows from this omission that the effect of compliance or noncompliance with the act or orders of the commission is to be determined by the rules of law in force at the time the act was adopted, that is, by the law of negligence.

The meaning and effect of the statutes carried forward in c. 336 were so firmly established by our decision law that we are not free to depart therefrom without legislating judicially. These statutes and the orders of the railroad and warehouse commission had been construed by our decisions, prior to the enactment of L. 1925, c. 336, to prescribe additional minimum requirements in addition to

the general duty to exercise due care, and not to constitute an entire code of regulation, superseding and excluding all law in existence at the time of their adoption. Shaber v. St. P. M. & M. Ry. Co., Zenner v. G. N. Ry. Co., Gowan v. McAdoo, and Crosby v. G. N. Ry. Co. *supra.* The readoption of these statutes by including them in L. 1925, c. 336, is a reënactment of the existing law with certain amplifications, as was stated in State ex rel. City of St. Paul v. M. St. P. & S. S. M. Ry. Co. *supra.* Thus, c. 336 contains the provisions of a number of statutes dealing with specific subjects. Laws readopted with a well established meaning attached to them by judicial construction are adopted with that meaning and construction. The construction is part of the statute, and the readoption of the statute adopts the meaning previously placed upon it by the courts. Wenger v. Wenger, 200 Minn. 436, 274 N. W. 517; Harrington v. State ex rel. Van Hayes, 200 Ala. 480, 76 So. 422; see Panama R. Co. v. Johnson, 264 U. S. 375, 44 S. Ct. 391, 68 L. ed. 748. That being true, c. 336 adopted the rule of the Shaber, Zenner, Gowan, and other cases, decided by this court prior to the enactment of c. 336, that those provisions do not abolish the general duty to exercise care in addition to that required by statute or order of the railroad and warehouse commission if the prudent management and operation of the road requires such precautions for the public safety. Nor does c. 336 contain a provision excusing a railroad from taking other precautions if the particular situation be such that due care requires them. Without a provision exonerating railroads from exercising such due care additional to the requirements of the statute, a construction that the statute has that effect is not permissible. Shaber v. St. P. M. & M. Ry. Co. *supra;* Erie R. Co. v. Weinstein (C. C. A.) 166 F. 271, *per* Lurton, Circuit Judge; Evans v. Erie R. Co. (C. C. A.) 213 F. 129; Elukowich v. New York, N. H. & H. R. Co. (D. C.) 291 F. 574. This is reënforced by the absence of a repealing clause, which is ordinarily necessary to repeal other provisions of law. Nor is there a repeal by implication. There is no conflict between the exercise of due care in the operation of trains on the crossing and the installation and maintenance of a safety sign or other device. The one may be in addition to the

other. Shaber v. St. P. M. & M. Ry. Co. *supra;* Grippen v. New York Cent. R. Co. 40 N. Y. 34, and other authorities *supra*. A law is not repealed by a later enactment if the provisions of the two laws are not irreconcilable or necessarily inconsistent. If both may stand and be operative without repugnance to each other, there is no repeal by implication. 6 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934, 1937) § 8927, and cases cited; 25 R. C. L. pp. 918 to 920, § 169.

In many of the cases cited *supra* the safety measures were required by a statute. In others they were required by order of a commission or other public authority similar to our railroad and warehouse commission. In the latter instance the authority exercised is a delegated power. Certainly the exercise of a delegated power by a commission or other public official should not be attended with results which the exercise of the same power by the legislature itself does not have. If the exercise of the power by the legislature does not operate to relieve railroads from the duty to exercise due care in other respects, the exercise of the power by its agent, the railroad and warehouse commission, should not have that effect. Even though the statute vests exclusive power in the commission with respect to the matters enacted, it does not have the effect claimed for it of establishing a complete and exclusive standard of safety so as to deal with the entire matter of safety.

Finally, it is claimed by the defendant that as a practical proposition a conflict arises between the duties of the company and the requirements of the statute and orders of the railroad and warehouse commission if it should be required to exercise any care in addition to that prescribed by the statute and such orders. That this contention is without merit has already been demonstrated. In the Shaber case we pointed out that the general duty to exercise due care and to observe the provisions of the statute exist together. In Grippen v. New York Cent. R. Co. 40 N. Y. 34, it was said that the duty to exercise due care stands, and the statute stands with it and both must be satisfied.

■ Whether the accident was proximately caused by defendant's negligence was a question to be determined by the jury. Failure to warn approaching travelers of a train on a crossing under condi-

tions in which a train or railroad crossing is not clearly visible has been held to be negligence. Lawler v. M. St. P. & S. S. M. Ry. Co. 129 Minn. 506, 152 N. W. 882 (smoke and steam in the air); Richard v. Maine Cent. R. Co. 132 Me. 197, 168 A. 811 (fog); Grippen v. New York Cent. R. Co. 40 N. Y. 34 (snow); Prescott v. Hines, 114 S. C. 262, 103 S. E. 543 (fog and smoke); Elliott v. M. P. R. Co. 227 Mo. App. 225, 52 S. W. (2d) 448 (dark and foggy); Depouw v. C. & N. W. Ry. Co. 154 Wis. 610, 143 N. W. 654 (darkness and dark surroundings so that the train was not plainly visible). Defendant cites to the contrary Crosby v. G. N. Ry. Co. 187 Minn. 263, 245 N. W. 31; Ausen v. M. St. P. & S. S. M. Ry. Co. 193 Minn. 316, 258 N. W. 511, and Olson v. C. G. W. R. Co. 193 Minn. 533, 259 N. W. 70. The concurring and dissenting opinions of Mr. Justice Loring in the two cases last cited point out some very practical considerations of law and fact in such situations. In the Ausen and similar cases, the train itself was held to be a warning because it could be seen by the driver of the car. But here the case is different. The train could not be seen because of conditions proximately caused by defendant's acts or omissions, united with other conditions existing at the crossing at the time of the accident.

Insofar as Olson v. C. G. W. R. Co. 193 Minn. 533, 259 N. W. 70, is in conflict with these views, it is overruled.

We have referred to the corporate defendant only in passing on the question of liability, since it is determinative of the only questions presented.

Reversed.

HOLT, STONE, and OLSON, JUSTICES (dissenting).

Modern means of fast transportation, especially since the advent of the automobile, and the consequent need for regulation thereof have combined to bring about much in the way of statutory rules applicable thereto. Citizens are in general familiar with the necessity of such; also, that many requirements have been adopted from time to time by state and municipal authorities to safeguard the public who have occasion to use our thoroughfares. That the field is one for legislative activity everyone will concede. Many and

varied rules of conduct have resulted. Railroad crossings in particular, more than any other perhaps, have brought into being much needed regulation by legislation. The state in its sovereign capacity has been solicitous in its efforts to care for its citizens.

Cases coming here for decision and involving rules laid down by legislative authority have been favorably considered and, as we recall, invariably sustained. Thus in State v. N. P. Ry. Co. 176 Minn. 501, 505, 223 N. W. 915, 916, the clash there involved came about by reason of claimed conflict of jurisdiction and consequent duty between the commissioner of highways and the railroad and warehouse commission. The court was of opinion that the acts there for consideration "forbade the commissioner of highways, as well as others, to establish a railroad crossing at grade without the approval of the commission." And further (176 Minn. 507):

"It will be noted that the legislature in the act of 1911 (c. 243) merely gave the commission power to require the installation of safety devices at a particular crossing upon complaint of particular public officers that such crossing was dangerous; that the legislature in each subsequent act added to the power previously given; and that the legislature in no act took away or limited the power given by a prior act. In enacting these several statutes, the legislature is presumed to have known and had in mind all existing laws relating to the subject matter and to have enacted them in the light of such knowledge; and they must be construed so as to harmonize with each other and give full effect to all so far as this may reasonably be done. 6 Dunnell, Minn. Dig. (2 ed.) § 8984, and cases cited.

*"Viewing the several enactments as a whole* for the purpose of ascertaining the legislative will as now expressed therein, *we reach the conclusion that the legislature intended to and did confer upon the commission power to determine all questions relating to the matter of railroad crossings,* including the power to require that public highways be carried over or under the railroad tracks at such crossings whenever it deemed a separation of grades feasible and necessary for the safety of travelers, * * *"

In the subsequent case of State ex rel. City of St. Paul v. M. St. P. & S. S. M. Ry. Co. 190 Minn. 162, 167, 251 N. W. 275, 277, it was held that:

"Users of railroads, no less than those of highways, are objects of the solicitude and care of government. Plainly it was the legislative thought *that the matter of safety of crossings should no longer be left to as many jurisdictions as there are municipalities, but that it should be brought under exclusive state control.*" (Italics supplied.)

The conclusions reached in these cases were unquestionably right. For the reasons there assigned, we came to a similar conclusion in Olson v. C. G. W. R. Co. 193 Minn. 533, 537, 259 N. W. 70, 72, where we held that the legislature had "made or provided for adequate rules and regulations respecting crossing signs and warnings"; that the act "indicates a clear intention" that the commission as an agency of the state should occupy the entire field and was by the act given "exclusive jurisdiction over all questions relating to" railroad crossings. The three cases mentioned all had to do with this particular chapter (L. 1925, c. 336, 1 Mason Minn. St. 1927, § 4743-1 to § 4743-17, inclusive). So it will be seen that we have uniformly and consistently held that the statute has for its object and purpose the safety of railroad crossing traffic. Public safety in respect of grade, overhead, or underpass crossings was deemed important enough so that "it should be brought under exclusive state control." (190 Minn. 167.) For exactly the same reasons and by virtue of the same legislative act, the commission was given the same authority to determine and provide for the form, size, and placement of signs, warnings, gates, and all other means for public protection.

Definite standards from competent state authority have resulted in well known and universally recognized improved safety conditions at our railroad crossings.

That the act was intended to be a grant of ample power to the commission to formulate rules and regulations respecting "all questions" relating to such crossings no one reading its provisions can

doubt. Its rules and requirements lawfully made carry with them criminal punishment for their violation. (§ 4743-17.)

The "judicial construction of a statute, so long as it is unreversed, is as much a part thereof as if it had been written into it originally." 6 Dunnell, Minn. Dig. (2 ed. & Supp. 1937) § 8936b, and cases cited in notes. Since the decision in the Olson case was handed down there have been held one regular and two extra legislative sessions. No change was made in the law. If that body had been of opinion that we were wrong in any or all of the cases here mentioned would not repeal or amendment have been made? That the membership knew thereof is apparent from the fact that at the 1937 regular session House File No. 688 was introduced. That bill sought to repeal this act (L. 1925, c. 336) and to reënact all acts that said chapter had repealed or amended. It failed of passage. Thus we have *actual* rather than *presumed* legislative approval of our interpretation of the act. Under these circumstances, therefore, the present majority opinion in effect and in reality is the equivalent of judicial legislation. It is doing that which the lawmaking body refused to do. " 'The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed.' " Van Beeck v. Sabine Towing Co. 300 U. S. 342, 351, 57 S. Ct. 452, 456, 81 L. ed. 685.

