# ETHEL JESTINGS
*vs.*
# HOWARD S. PALMER, TRUSTEE, ET ALS.

Court of Common Pleas     Fairfield County    File No. 32160

## MEMORANDUM FILED JUNE 8, 1942.

*Joseph Shelnitz,* of New Haven, for the Plaintiff.

*James W. Grady,* of New Haven, for the Defendants.

Memorandum of decision in action arising out of destruction of automobile stalled on railroad crossing.

FITZGERALD, J. Plaintiff brings this action against the trustees of the New York, New Haven & Hartford Railroad Company (said company being a railroad corporation and the named defendants—Messrs. Palmer, Loomis and Sawyer—hereinafter referred to collectively as the defendant railroad, having placed on them the responsibility of the management and control of said railroad in proceedings for reorganization under the National Bankruptcy Act and amendments thereto) to recover damages for the total destruction of her 1939 Hudson sedan on the early evening of December 24, 1940, and for the destruction of certain items of personal property in said car at the time in question.

It appears that on December 24, 1940, plaintiff and her husband left their Newark, New Jersey, home and drove up to Connecticut to spend the Christmas holidays with their friends, a Lussier family, who lived in Groton. The Lussiers occupied as tenants a dwelling house on a strip of land in Groton located to the east of double tracks of the defendant railroad, which tracks are part of the "Shore Line" division of the railroad extending between Providence to the north and New Haven to the south. The owner of the property thus occupied by the Lussiers derives title thereto through her forbearers, commencing with one F. H. Bradley, her grandsire. The property has been in the Bradley family since 1861, title having

been acquired in that year by the said F. H. Bradley from The New Haven, New London & Stonington Railroad Company, which corporation the defendant railroad succeeded subsequent thereto and many years before December 24, 1940. The dwelling house thereon, occupied by the Lussier family, was constructed sometime in 1915.

The only means of ingress and egress for a motor car to and from this property is by crossing the aforesaid tracks (the easterly pair being used by the defendant railroad for its north-bound traffic in the direction of Providence and Boston and the westerly pair for its southbound traffic in the direction of New Haven and New York) at a point called "Bradley's Crossing." This crossing is a combination of gravel and wooden planks, and was maintained by the officials of the defendant railroad on December 24, 1940, and for many years prior thereto.

On said December 24, 1940, at about 6:30 p.m., or a few minutes thereafter, plaintiff's car (her husband operating and she a passenger therein) proceeded to cross Bradley's Crossing to enter the premises occupied by the Lussiers. The long journey from Newark was almost at an end. But a perverse destiny played an ignoble part. The car became stalled and in its motionless state straddled across the southbound tracks leading to New Haven and other points south. The efforts of plaintiff's husband to get the car started were of no avail.

The stalling of plaintiff's car was not due to any physical condition or state of disrepair of the crossing, but rather be-cause of some mechanical defect in its engine.

At exactly 6:48 p.m.—several minutes later—"The Mer-chant's Limited", a fast train out of Boston to New York, via Providence, rammed into the car, totally destroying it as well as wearing apparel, Christmas gifts to the Lussiers, etc., con-tained therein. The engineer, a seasoned and experienced em-ployee of the defendant railroad, brought the train to a stop 1,482 feet south of Bradley's Crossing.

Notwithstanding the strongly pressed claims of the defendant railroad that plaintiff was contributorily negligent because of the fact that the car stalled as it did, and that plaintiff's hus-band as her agent had a sufficient opportunity to, and could have, rolled the car off of the tracks before the accident, the

court finds that there is no material contributory negligence chargeable to plaintiff.

The question decisive of the case, therefore, is whether plaintiff has established by a fair preponderance of the evidence one or more material allegations of negligence on the part of the defendant railroad, its servants and agents, and whether such negligence, if negligence there be, was a proximate cause of the accident in question.

After the presentation of evidence counsel for the parties fully argued the case both orally and in briefs. In arriving at what it considers to be the correct decision in the case the court has tried to keep in mind the wise comment of Justice Banks in *Lomas & Nettleton Co. vs. City of Waterbury*, 122 Conn. 228, 234: "Law suits are not determined by a consideration of philosophy in the abstract, but by the application of legal principles to the facts of a particular case."

The accident occurred in the early evening, but nevertheless in the night season. The evidence discloses that the electric headlight on the engine (Golden Glow type, 32 volt, 250 watt bulb), at the very most, could penetrate and light up the darkness ahead (and the tracks on a straight stretch) for a distance of 800 feet at best. The engine itself is a large steam locomotive, Pacific type, using soft coal for fuel, and weighing 222 tons. The distance between the front of the engine and the engineer's cab is 40 feet. On the evening in question the engine was drawing seven Pullman cars. This train was and is designated as "The Merchant's Limited", a fast train, leaving Boston at 5 p.m. and arriving at New York at 9:15 p.m. The distance between Boston and New York is 232 miles; between Boston and Providence is 43.8 miles; between Providence and the scene of the accident is 53.7 miles. Also, the train on the evening in question was running substantially according to schedule. "The Merchant's Limited" is obviously intended to meet the needs of those members of the public who are required to travel in a limited time between the great cities of Boston and New York, and intermediate points.

Some few thousand feet north of Bradley's Crossing the train on the evening in question slowed down to 45 m.p.h. at the Mystic Drawbridge. This was a restricted speed established by the railroad officials at this point. A curve in the tracks is also located north of the crossing in question. The

tracks are substantially straight, however, for at least 1,045 feet north of said crossing.

The engineer testified, in substance, that he first observed what appeared to him to be a commotion at Bradley's Crossing when the front of his engine was between 500 and 600 feet north thereof; that he saw the figure of what appeared to be a person in a white sweater run from the tracks to the west side thereof. This was plaintiff's husband. The engineer then applied the brakes. At the time the brakes were applied the front of the engine was between 50 and 60 feet north of said crossing and the stalled car. The engineer also testified that the train was commencing to pick up speed after the aforesaid 45 m.p.h. slowdown, and that at the time he applied the brakes its speed was about 50 m.p.h.; that he stopped the train as soon as he could and that in no event could he have stopped it within 800 feet (the distance lighted up on a straight stretch by the engine's electric headlight), or even within 1,045 feet (the distance between Bradley's Crossing and the crossing north thereof).

The engineer's testimony de speed and capacity of engine headlight was substantiated by the fireman, who is also a veteran employee of the defendant railroad. The court accepts the testimony of these witnesses. Plaintiff offered no contrary evidence de ability of train to come to a complete stop within 800 feet, or within any specific distance for that matter, when traveling at a speed of 50 m.p.h. The court cannot indulge in speculation, surmise and conjecture. It must accept the evidence given at the trial. Consequently, had the engineer in fact seen the car when the engine was 800 feet north thereof, and immediately recognized that the car was stalled and in a helpless state, or if the engineer should have seen and recognized the existing condition at Bradley's Crossing, but did not, the fact still remains that *the train could not have been brought to a complete stop to have avoided the accident even within 800 feet, or a greater distance.* This aspect in itself is decisive of the case, for plaintiff has offered no evidence to warrant the court in finding that the train *could have been stopped in time to avoid the accident.*

The fact that Mrs. Lussier ran up the track to flag the train and then, recognizing the futility of so doing, commenced to return to the car, is of little importance. She wore a dark

coat and exactly what the lady did, if anything is not clear on the record.

The fact that plaintiff's husband may have turned on and off the headlights of the car for a few minutes before the accident, as a signal of distress and warning, does not effect the decision of the case. As noted previously, the train came around a bend north of the scene of the accident, and the flashing on and off of auto lights which pointed easterly is of doubtful, if not negative, significance.

Plaintiff's claims, in the main, are that in crossing Bradley's Crossing her status was that of an invitee; that the defendant railroad was under the duty to anticipate at a crossing of this character that a car might become stalled, as her car did; that the private crossing was unprotected; that the train was traveling at a high and dangerous rate of speed, without regard to surrounding circumstances and location; that the engineer and fireman did not have the train under proper control and did not maintain a proper lookout and failed to observe the peril of her car, etc.

For the court to answer specifically all of the aforesaid claims would result in some repetition of what has already been stated as well as involve stating other subordinate facts thus prolonging a memorandum that is already of considerable, if not excessive, length. It is deemed sufficient to say that the status of plaintiff was probably that of a licensee and not of an invitee, but even if she were an invitee the outcome of the case would be no different. Bradley's Crossing is located at a point on the tracks where great numbers of people are not apt to cross, and did not cross in December, 1940. The crossing was a private crossing. Also, the fact that the fireman was attending to the engine's water system just before the accident and was not perched in his cab gazing forward, could not have altered matters in view of what has previously been said.

In short, to place the burden upon the defendant railroad required by plaintiff's claims, in the light of the evidence in the case, would result in a national calamity, for railroad systems perform a vital function in the life of the nation. For the defendant railroad, its servants and agents, to have anticipated the presence of plaintiff's stalled car at a crossing such as Bradley's Crossing would, to say the least, approach the

fantastic. The sympathy that the court feels for the plaintiff cannot be permitted to effect rules of logic and principles of law. Plaintiff has suffered damages but no legal liability is found to exist on the part of the defendant railroad.

The discussion of our Supreme Court in the following cases has been helpful in analyzing the limits of the controlling question: *Dyson vs. New York & New England R.R. Co.,* 57 Conn. 9; *Andrews vs. New York & New England R.R. Co.,* 60 id. 293; *Pomponio vs. New York, New Haven & Hartford R.R. Co.,* 66 id. 528; *Freedman vs. New York, New Haven & Hartford R.R. Co.,* 81 id. 601; *Elliott vs. New York, New Haven & Hartford R.R. Co.,* 84 id. 444; *Tefft vs. New York, New Haven & Hartford R.R. Co.,* 116 id. 127; and *Pratt, Read & Co. vs. New York, New Haven & Hartford R.R. Co.,* 102 id. 735. *See, also, Markar vs. New York, New Haven & Hartford R.R. Co.,* 77 F. (2d) 282, and particularly, 3 *Blashfield, Cyclopedia of Automobile Law and Practice* (perm. ed. [1935] §1702), and cases contained in footnotes.

The controlling issues are found for the defendant railroad. Judgment will enter accordingly.