STATE EX REL. BOARD OF EDUCATION OF THE CITY OF
WATERBURY *v.* ROBERT J. QUINN, JR.

SUPERIOR COURT  NEW HAVEN COUNTY  FILE No. 32856
AT WATERBURY

Memorandum filed May 8, 1969

*William J. Secor, Jr.,* of Waterbury, for the plaintiff.

*Vincent P. Matasavage,* corporation counsel, and *John S. Phelan,* assistant corporation counsel, of Waterbury, for the defendant.

*Robert L. Krechevsky,* of Hartford, filed a brief as amicus curiae.

MacDonald, J. In this action of mandamus, brought by the state's attorney at Waterbury, the relator, or real plaintiff, is the board of education of the city of Waterbury, which seeks to require the defendant Quinn, as comptroller of the city of Waterbury, to pay increased salaries to certain teachers in accordance with a schedule contained in a contract entered into between the board of education and the Waterbury Teachers Association under the provisions of § 10-153d of the General Statutes. The case has been submitted to the court on a stipulation of facts.

The narrow and overriding issue presented to the court is whether the charter provisions of the city of Waterbury take precedence over a contract executed pursuant to and under the limitations of § 10-153d of the General Statutes. More specifically, does the charter, with particular reference to §§ 903 (a), 1336, and 1338, grant to the Waterbury board of finance and board of aldermen, respectively, the ultimate review and control of the teachers' salaries and the amounts thereof, regardless of an agreement negotiated and executed by the Waterbury board of education and the Waterbury Teachers Association pursuant to § 10-153d of the General Statutes? The defendant's first special defense argues that the Waterbury charter controls the funding of the budget of the department of education and requires that the teachers be paid in accordance with the specific limitations on appropriations made by the board of aldermen. The third special defense claims specifically that a contract entered into under § 10-153d does not take precedence over charter requirements. The following discussion will encompass both of these special defenses and would appear

strongly to support the position of the defendant for the several major reasons hereinafter considered and stated.

## A

An analysis of the specific language of the statutory provisions involved, their legislative history and the recognized rules of statutory construction all support the position of the defendant.

It has been stipulated that the contract in this case was executed by the board of education and the teachers association pursuant to the provisions of §§ 10-153b, 10-153c, and 10-153d and that the act which includes those sections contains no express provision indicating that the terms of such a contract take precedence over any general statute or charter. Section 10-153d in its original form was § 3 of Public Acts 1965, No. 298, entitled "An Act concerning the Right of Teachers' Representatives to Negotiate with Boards of Education."

It is extremely interesting to compare the act just mentioned, which directly concerns this case, with another act passed at the same session of the legislature, Public Acts 1965, No. 159, entitled "An Act Establishing a Municipal Employee Relations Act," now designated as §§ 7-467 through 7-477 of the General Statutes and containing the following pertinent provisions: (1) Excluding certified teachers from the definition of "employee" for purposes of that act § 7-467 [2]). (2) Requiring that an agreement negotiated thereunder "shall be reduced to writing" (§ 7-474 [b]). (3) Requiring that "a request for funds necessary to implement such written agreement and for approval of any provisions of the agreement which are in conflict with any charter, special act, ordinance, rule or regulation adopted by the municipal employer or its agents . . . shall be

submitted by the bargaining representative of the municipality within fourteen days of the date on which such agreement is reached . . ." (§ 7-474 [b]). (4) Stating that "[n]otwithstanding any provision of any general statute, charter, special act or ordinance to the contrary, the budget-appropriating authority of any municipal employer shall appropriate whatever funds are required to comply with a collective bargaining agreement, provided the request called for in subsection (b) of . . . [§ 7-474] has been approved by the legislative body of such municipal employer" (§ 7-474 [c]). (5) Stating that [n]o provision of any general statute, charter, special act, or ordinance shall prevent negotiations between a municipal employer and employee organization . . ." (§ 7-474 [e]). (6) Providing that "[w]here there is a conflict between any agreement reached by a municipal employer and an employee organization and approved in accordance with the provisions of sections 7-467 to 7-477, inclusive, on matters appropriate to collective bargaining, as defined in said sections, and any charter, special act, ordinance, rules or regulations adopted by the municipal employer . . . , the terms of such agreement shall prevail" (§ 7-474 [f]).

By contrast with the above provisions of the municipal employees' bargaining law, § 10-153d of the teachers' negotiating law (1) states that the "execution of a written contract incorporating any agreement reached if requested by either party" is an obligation on the part of the board of education, instead of being mandatory, and (2) completely omits the repealer language of §§ 7-474 (c), (e) and (f).

In summary, the legislature, in its wisdom, at the same session decreed (1) that municipal employees other than teachers, through the collective bargain-

ing process, could effect with the municipal employer agreements which must be funded and implemented, any charter or other requirement to the contrary notwithstanding; and (2) granted teachers only the mechanism of selecting duly authorized representatives for the purpose of negotiation and only the right to demand that the board of education negotiate with such duly authorized representatives. A contrast of the so-called "strong arm" repealer language of §§ 7-474 (c), (e) and (f) with that portion of § 10-153d stating, ". . . but such obligation shall not compel either party to agree to a proposal or require the making of a concession," seems to indicate a definite legislative direction that agreements with municipal employees other than teachers, once ratified, must be funded and paid in accordance with the terms thereof, but that in the case of agreements with teachers, there is no such requirement of funding and no requirement that either party agree to any proposal or make a concession. The refusal or, at least, failure of the legislature to grant the repealer language of § 7-474 to a § 10-153d contract strongly supports the defendant's position.

The conclusion stated above likewise is supported by the fundamental rules of statutory construction, for it is well settled that a special statute is not affected—either wholly or even partially repealed—by a general statute unless there is a plain indication of intent that the general act shall repeal the special act. *State ex rel. Wallen* v. *Hatch,* 82 Conn. 122, 124; *New York, N.H. & H.R. Co.* v. *Bridgeport Traction Co.,* 65 Conn. 410, 429; *Galliot* v. *Zoning Board of Appeals,* 26 Conn. Sup. 260; *Laurel Beach Assn.* v. *Gilli,* 15 Conn. Sup. 69, 72. As repeatedly stated by our Supreme Court, the question for the court is not what the legislature intended but what intention it expressed. *Mad River Co.* v. *Wolcott,* 137 Conn. 680, 686; *Connecticut Light & Power Co.* v. *Walsh,*

134 Conn. 295; *Finoia* v. *Winchester Repeating Arms Co.*, 130 Conn. 381, 385; *Lee Bros. Furniture Co.* v. *Cram*, 63 Conn. 433, 438.

Inasmuch as the legislature at the same session gave very limited rights to teachers and very sweeping and powerful rights to other municipal employees, there is particular significance to the line of cases in which it has been stated that there is a presumption that the legislature, in enacting a law, did it in view of existing relevant statutes and intended the enactment to be read with them so as to make one consistent body of law. *State* v. *Jordan*, 142 Conn. 375, 378; *Jennings* v. *Connecticut Light & Power Co.*, 140 Conn. 650, 657; *Coombs* v. *Darling*, 116 Conn. 643, 646.

The budget-making process of the city of Waterbury is outlined in §§ 1336, 1337 and 1338 of its charter, and § 903 (a) specifically empowers the board of finance to approve teachers' salaries prescribed by the board of education. 31 Spec. Laws 249, No. 245; 26 Spec. Laws 693, No. 7 § 1; 29 Spec. Laws 320, No. 371; 23 Spec. Laws 173, No. 244. In accordance with its budget-making responsibilities, the board of finance exercised its powers under § 903 (a) by disapproving the pension provisions and the ratio schedule for administrative-supervisory personnel detailed in the contract at its budget meetings of November 21 and 22, 1967, and the board of aldermen recognized its responsibility as the ultimate authority in the proper overall fiscal management of the affairs of the city of Waterbury, as indicated in the minutes of its meeting of December 21, 1967, in which appears the statement of the minority leader containing the following words: "When we get through with these deliberations, we will have put together a Budget which is less than the amount recommended by the Board of Finance

with the tax rate lower than recommended by the Board of Finance but to the best of our knowledge will not impair to any great extent the reasonable efficient operation of our City government . . . ."

These words compare rather strikingly with the criteria outlined in *Board of Education* v. *Board of Finance,* 127 Conn. 345, 350: "Where a town board of education includes in the estimates it submits to a board of finance expenditures for a purpose which is not within the statutory provisions imposing a duty upon it nor within one which vests it with a discretion to be independently exercised, the board of finance may, if in its judgment, considering not only the educational purpose to be served but also the financial condition of the town, it finds that the expenditure is not justified, decline to recommend an appropriation for it . . . ."

## B

Connecticut authorities cited in support of plaintiff's position are not controlling.

In the very comprehensive and carefully considered briefs filed by counsel for the board of education, and for the Connecticut Education Association as amicus curiae, great stress is laid on certain decisions of our Supreme Court, especially that in *State ex rel. Board of Education* v. *D'Aulisa,* 133 Conn. 414, which, because of many similarities to the present case, requires thorough discussion. The *D'Aulisa* case is cited by plaintiff for the proposition that the defendant therein, the comptroller of the city of Bridgeport, whose duties were purely ministerial, had no authority to do other than to certify that there were sufficient funds available in the Bridgeport board of education budget for payment of certain teachers' and superintendents' payroll items when, at the time of submission to him of such

items for payment, there actually existed in the board of education budget an appropriation in excess of such payroll items. In the course of its opinion, the court stated (p. 419) as a major premise the oft-cited proposition that a board of education is an agency of the state in charge of education in its town, citing in support of this major premise, as do the plaintiff and amicus curiae in this case, *Groton & Stonington Traction Co.* v. *Groton*, 115 Conn. 151, 155, and *Board of Education* v. *Board of Finance*, 127 Conn. 345, 349. The court did, however, note in *D'Aulisa* that there was a limitation to the extent "found in statutory provisions" and that such statutory provisions included special acts in the nature of charter provisions. Here, of course, the Waterbury board of education is a creature of charter. Waterbury Charter §§ 901–906 (1967); 21 Spec. Laws 640, §§ 267–272, as amended, 23 Spec. Laws 173 (and by referendum Nov. 8, 1966).

As a matter of fact, the phrase, "a board of education is an agency of the state," can be and frequently is given more significance than it warrants. Certainly a board of education is an agent of the state in the sense that it fulfils the state-prescribed duty of providing education for the youth of its community, but it is not a state agency in the same sense as is the state highway or motor vehicle or welfare department. It is not a state agency in a basic financial sense, for although the state does provide various funds and grants to local communities for educational purposes, it is only too well known to all taxpayers that the largest single budgetary item of practically every town in the state is the educational budget.

In *State ex rel. Board of Education* v. *D'Aulisa*, supra, error was found in the reasons advanced by the trial judge for not issuing the writ of peremp-

tory mandamus, his reasoning being that since the record was silent as to the reasons behind the plaintiff's action, the court was left in the position of being unable to determine whether other adequate remedy existed (see 14 Conn. Sup. 280, 289), a point which the Supreme Court brushed aside by merely stating (p. 423) that it "sufficiently appears that there is no other sufficient remedy." Since the court did not reverse with the direction that a writ of mandamus should issue but remanded with instructions, *D'Aulisa* is inconclusive and does not squarely come to grips with the basic problem which we are discussing: the amount of control which the board of finance can exercise over the budget of the board of education.

The case of *Board of Education* v. *Board of Finance*, 127 Conn. 345, cited by the court in *D'Aulisa* and in the briefs of the plaintiff and the amicus curiae here, contains the following pertinent language (p. 350): "Where a town board of education includes in the estimates it submits to a board of finance expenditures for a purpose which is not within statutory provisions imposing a duty upon it nor within one which vests it with a discretion to be independently exercised, the board of finance may, if in its judgment, considering not only the educational purpose to be served but also the financial condition of the town, it finds that the expenditure is not justified, decline to recommend an appropriation for it; where, however, the estimate is for an expenditure for a purpose which the statutes make it the duty of the board of education to effectuate or they vest in the board of education a discretion to be independently exercised as to the carrying out of some purpose, the town board of finance has not the power to refuse to include any appropriation for it in the budget it submits and can reduce the estimate submitted by the board of education only

when that estimate exceeds the amount reasonably necessary for the accomplishment of the purpose, taking into consideration along with the educational needs of the town its financial condition and the other expenditures it must make. The board of finance in such a case must exercise its sound judgment in determining whether or to what extent the estimates of the board of education are larger than the sums reasonably necessary and if it properly exercises its discretion and the budget is approved by the town the board of education has no power to exceed the appropriations made." And again (p. 353): "It is also true that where a board of finance reduces an estimate of a board of education so that the sum appropriated is less than is reasonably necessary to carry out the purpose to be served or where it takes such action not in the exercise of a sound judgment but from improper motives or without sufficient understanding, there would seem to be no adequate remedy which the board of education might effectively invoke. The legislature, however, evidently deemed it necessary in the interests of sound municipal finance to give to town boards of finance the powers we have outlined. If such boards do not exercise their judgment intelligently, fairly and disinterestedly, the situation is one, unfortunately not unknown, wherein a public official fails properly to perform the duties of his office, and the remedy is that inherent in the theory of representative government, to replace him by another."

In *Board of Education* v. *Ellington,* 151 Conn. 1, the court found that the board of finance was acting erroneously and illegally in attempting to circumvent *Board of Education* v. *Board of Finance,* 127 Conn. 345, by setting up a separate contingency fund in the town budget to be used for educational purposes as the board of finance directed. The *Elling-*

*ton* case is cited by the plaintiff for the proposition that control of the expenditure of funds appropriated for education is within the sole discretion of the board of education. The court, however, in that case notes (p. 9): "This is not to say that the board of education can act without restraint and that the board of finance cannot control the total amount of appropriations." Similar language appears in practically all of the authorities cited, and by whatever road we detour, we seem to arrive at the same conclusion—that ultimate control of the amounts of teachers' salaries remains in the board of finance and board of aldermen.

## C

The position of the defendant is supported by considerations of practicability and common sense as well as by legal precedent and statutory construction.

A comparison of the two statutes discussed at length under "A" above, namely Public Acts 1965, No. 298, pertaining to teachers and Public Acts 1965, No. 159, pertaining to municipal employees in general, shows that the legislature did not give the teachers what other municipal employees got and strongly indicates that the legislative intent was to have the ultimate check on their financial demands in the hands of the final budget-making authority. It would not be stretching the point too far to take judicial notice of the fact that the legislature which passed these two acts was largely composed of individuals knowledgeable in local politics who were well aware of the enormous demands made upon local budgets by local departments of education and equally aware that many large communities had charter provisions, similar to those in the Waterbury charter, granting the ultimate budget-making authority, be it board of finance, board of aldermen

or board of selectmen, final control over the department of education's budget. With this in mind, it is easy to understand why the 1965 legislature decided and specifically acted to leave the matter of teachers' salaries in the "political arena" referred to in *Board of Education* v. *Board of Finance,* 127 Conn. 345, 353: "If the result brought about by the statutes, which are evidently designed to produce a nice balancing of powers between the two boards do not serve the public interests, the recourse is not, where no justiciable rights are involved, to seek to make the courts arbiters in a controversy essentially political, but to ask the legislature to change or better define the respective powers of the boards."

The reference to politics is not intended to be derogatory but only realistic. The real parties at interest here are the Waterbury Teachers Association and, indirectly, the Connecticut Education Association, "a voluntary association composed of over 20,000 members of the teaching profession throughout the State of Connecticut," according to its motion for permission to file a brief as amicus curiae. This represents a powerful lobbying organization, and if the teachers ultimately decide that their goal will be best served by receiving the same treatment with respect to salary increases as that afforded to other municipal employees, they should ask the legislature to change or better define the respective powers of the boards involved—education, finance and aldermen.

There are, of course, other rather fundamental reasons for teachers, as a group, to be considered by the legislature in a different light. They are highly educated individuals who are particularly well qualified to articulate their demands to the local boards of education in the first instance and finally to the financial authorities of their respective towns.

By reason of the professional nature of their work and their yearly schedule, involving a summer recess devoted to achieving additional academic standing and keeping abreast of current academic developments, there is additional reason to treat teachers in a different fashion from other municipal employees, whose work and work schedule is more closely allied to workers in other sectors of our business and industrial economy—despite the fact that there appears to be a recent trend on the part of the teachers to claim what might be termed certain "striking similarities."

The court recognizes that many of our teachers are sadly underpaid and would like to see corrections in the existing inequities of their position with relation to other groups whose work is less demanding of vitally skilled education and equally vital educational skill. Until the legislature decrees otherwise, however, the final say as to teachers' salaries rests with the ultimate budgetary control of the board of finance and board of aldermen.

The court has reached the conclusion that § 905 (2) of the Waterbury charter was complied with in that the difference between the "alternate amendments" of the board of education and the "recommendations of the Board of Finance" was only approximately $27,000 out of a total of $8,500,000, which is hardly to be characterized as "substantially more." Accordingly, there was no need for the board of finance to submit two tax rates to the board of aldermen.

In view of the foregoing conclusions, it is not necessary to consider other reasons why the plaintiff is not entitled to a writ of mandamus, and judgment may enter in favor of the defendant without costs.